No. 62,693

STATE OF KANSAS, *Appellee*, v. OSCAR L. BURNISON, ROGER P. ODEN, and JAMES H. "FUZZY" WIDENER, *Appellants*.

(795 P.2d 32)

Opinion filed July 13, 1990.

*Lucille Marino,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellants Burnison and Widener.

*Joel B. Jackson,* of Great Bend, argued the cause and was on the brief for appellant Oden.

*Roger Peterson,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Oscar L. Burnison, Roger P. Oden, and James H. "Fuzzy" Widener appeal their first-degree murder convictions (K.S.A. 21-3401), claiming the trial court erred in (1) admitting physical evidence it had previously suppressed, (2) failing to instruct on involuntary manslaughter as a lesser included offense of first-degree murder, (3) refusing to instruct the jury on the unreliability of voice identification, (4) rejecting Burnison's request for a continuance, and (5) admitting the redacted statement of Widener into evidence.

Richard Ebert was killed by two shotgun blasts in his tavern, Captain's Galley, located near Kanopolis Lake in Ellsworth County on July 1, 1987, at approximately 10:00 p.m. The Deputy Sheriff, who found Ebert's body, testified he had been at the Captain's Galley around 6:45 p.m. in response to Mr. Ebert's complaint that "Fuzzy" Widener had stolen his dog earlier that evening. The deputy located Widener's car at Jake's Place. After retrieving the dog, the deputy advised Widener, who had been

drinking, not to drive or he would be arrested for driving under the influence. When the deputy returned the dog to the Captain's Galley at approximately 9:15 p.m., Ebert was alone. At 9:56 p.m. the sheriff's office received a call from Jeanette Ebert, the victim's wife, saying the defendants were at the Captain's Galley and there might be trouble. When the deputy returned to the tavern for the third time, he found Ebert's body on the tavern's floor and the cash register full of money.

Brian Werth, who operated the fireworks stand across from Jake's Place, testified that after the police took the dog, Widener talked about getting the dog back before reentering Jake's Place. Werth stated that around 8:35 p.m. Burnison and Oden drove into town in Burnison's red Dodge Ram truck. At 9:00 p.m. he saw all three defendants, in Burnison's truck, heading towards the Captain's Galley.

Jeanette Ebert had known the defendants for more than a year. Widener was considered a grandfather to the Eberts' child. Burnison and Oden were regular customers, frequenting Ebert's tavern two to three times a week. Mrs. Ebert was at the tavern with her husband on July 1, 1987, when Widener arrived that afternoon. She testified Widener said her husband was in trouble as Oden had filed an action in small claims court to get a car title from Ebert. Widener then went to the back of the tavern, returned arguing with Mr. Ebert, and left at 6:30 p.m. with Ebert's dog in his Plymouth car. Mrs. Ebert testified that around 9:00 p.m., she left the tavern for their trailer because her husband told her, "I don't want them going to the trailer and stealing anything." When asked what her husband meant by "them" she answered, "The defendants."

When Mrs. Ebert arrived at home at 9:25 p.m. she phoned the neighbors and then phoned her husband, who advised her he would call her after the customers left. He returned her call around 9:46 p.m. Since the telephone was capable of picking up sound, she heard the tavern's door open, followed by her husband's statement, "Oscar is here with a shotgun." When she asked if Fuzzy was there, he responded, "Fuzzy and Roger too." After Ebert told her to call the Ellsworth County sheriff, she heard Oden yell, "[D]o you want it now?" Her husband responded, "[W]ait a minute." Oden said, "[G]et off the fucking phone."

Then she heard a loud noise. She yelled to her husband. The only response was a second loud noise. She immediately called the sheriff's office.

Prior to their arrest, all three defendants had been drinking. When arrested, no weapons were found on the defendants. At the time the defendants were booked into the county jail, each of the defendant's property was taken, inventoried, and placed in separate property ,envelopes, and the contents were listed on the outside of each envelope.

After his arrest Widener gave three statements to law enforcement personnel. His first two statements were given on July 1, 1987. First, he stated to a K.B.I. agent he had never left Jake's Place. He then changed his statement and admitted he and the other two defendants had driven back to the tavern in his car to talk to Ebert about the dog, but when they left there had been no trouble. On July 2, 1987, Widener gave a third version, admitting he had gone to the tavern with the other two defendants, who were armed with shotguns. He stated that while he was in the bathroom, he heard shots.

At trial the pathologist testified Ebert's death was caused by two gunshots fired about 9 to 15 inches from the body, lodging in the chest cavity and in the jaw. The time of death was estimated at 10:00 p.m. A K.B.I. forensic scientist testified that (1) the plastic shotgun cup waddings found on the tavern floor and removed from the victim's liver were consistent with Remington Peters brand shotgun shells from a 12 gauge shotgun; (2) the other waddings found in the cooler were consistent with Federal Cartridge Corporation brand shotgun shells; (3) the lead shot pellets found in the tavern were consistent with number six size shot; and (4) the lead shot pellets recovered from the deceased's body were consistent with number four size shot.

A search of Burnison's shed produced a Winchester 12 gauge shotgun loaded with Remington Peters brand number four shot shotgun shells and an ERA double barrelled sawed-off 12 gauge shotgun. Retrieved from Burnison's pickup were unfired Remington and Federal brand 12 gauge shotgun shells of number four and six shot along with fired number six and eight shot Remington shells and fired Federal number four, six, and eight shot shells. At Oden's residence a Winchester model 1200 pump

shotgun, loaded with Federal brand shells and Remington Peters 12 gauge number eight shot shells were found. At Widener's home an unloaded J.C. Higgins 20 gauge shotgun was found but no shotgun shells. At trial the State's evidence was inconclusive as to whether any of the shotguns seized had fired the shells found at the scene.

During the trial the State moved to admit Widener's statements in redacted form. First, the State deleted the references to the other two defendants, but still left in Widener's July 2 statement that he had heard two shots while in the bathroom. Since the July 2, 1987, redacted statement would implicate the other two defendants, the court determined admission of that statement violated *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). Later during trial, the State moved to admit the July 1 statement of Widener in redacted form which stated that Widener drove to the tavern and talked with Ebert about the dog, and that everything was fine when he left. The court found this July 1 statement as redacted did not violate the rights of the codefendants and admitted it into evidence. Counsel for Oden and Burnison objected to the July 1 redacted statement.

Because there was evidence that the defendants had been drinking prior to their arrest, they requested an instruction on involuntary manslaughter (K.S.A. 21-3404). The trial judge found there was no substantial evidence to support an involuntary manslaughter instruction when a victim receives two shotgun wounds at a close range of 12 inches. In addition, the court refused Oden's request for a cautionary jury instruction on Mrs. Ebert's phone identification of Oden's voice.

Prior to oral argument we were advised that Widener died on September 13, 1988. On appeal the defendants raise five claims of trial error. Relevant facts as to each claim will be stated when necessary.

## ADMITTING EVIDENCE PREVIOUSLY SUPPRESSED

The defendants contend the trial court abused its discretion by admitting the evidence it had previously suppressed. The evidentiary value of a silver cigarette lighter was not discovered until September 1, 1987, when Jeanette Ebert visited the sheriff's office to advise them of her new address. After giving her new address,

she inquired if her husband's silver lighter, inscribed on one side "To Richard" and on the other "From Becky" (one of Ebert's former wives), had been found. Mrs. Ebert had observed her husband use the lighter the day he was shot. The sheriff recalled that Burnison's property envelope listed four lighters. Mrs. Ebert examined the lighters in Burnison's property envelope and found her husband's missing lighter.

The jury trial, originally scheduled for October 28, 1987, was continued at defendants' request to April 18, 1988. On April 12, 1988, the prosecutor became aware that the deceased's lighter had been discovered in Burnison's property envelope when he received the sheriff's report, dated September 1, 1987. He immediately mailed a copy to each defendant's counsel. On Friday, April 15, 1988, the defendants received the report.

It was not until the day jury selection commenced, April 18, 1988, that defense counsel made their first attempt to keep the fact of the discovery of the lighter from the jury by filing a motion in limine requesting the State be prohibited from mentioning the lighter in its opening statement to the jury. The motion was denied. The State mentioned the lighter in opening statements April 21, 1988. On April 22, 1988, seven days after receiving the report and five days into trial, the defendants again moved to suppress the admission of the lighter into evidence. The trial judge, after finding that the prosecutor had not intentionally withheld the report, granted the defendants' motion to suppress the evidence. On April 25, 1988, the State moved to have the court reconsider its suppression of the lighter. The motion was argued on April 26, 1988. On April 27, 1988, the court reversed its earlier suppression ruling, finding it had incorrectly applied the *Bruton* doctrine to the physical evidence. *Bruton v. United States*, 391 U.S. 123, applies to a defendant's statements and not to physical evidence. The court then denied the defendant's motion for a week's continuance to verify the police records.

The defendants contend the court's reversal of its suppression order after the trial had commenced, allowing the police report and the cigarette lighter into evidence, denied them a fair trial. They argue the prosecution's late production of the sheriff's report and physical evidence violated the discovery order and K.S.A. 22-3212(7), which "prohibits [a] party from introducing in evi-

dence the material not disclosed." The defendants contend that because the trial court reversed its ruling so late in the trial, they were unable to abandon their pretrial strategy not to testify or to pursue separate avenues of defense.

Discovery is to be as full and complete as is reasonably possible under the circumstances. *State v. Humphrey,* 217 Kan. 352, Syl. ¶ 1, 537 P.2d 155 (1975). At a pretrial conference on February 4, 1988, the prosecution was ordered to disclose all its evidence. K.S.A. 22-3212. The defendants claim it does not matter whether the prosecutor's knowledge was separate from the sheriff's department or if he in good faith made the report available as soon as he became aware of its existence as there is no excuse for the failure to disclose the evidence on September 1. We agree. In *Humphrey* we interpreted K.S.A. 22-3212 to require disclosure of statements and reports "in the possession of the law enforcement agencies including the police, the county attorney, or the attorney general of the state of Kansas." *Humphrey,* 217 Kan. at 357. See also *State v. Johnson & Taylor,* 223 Kan. 119, 124, 573 P.2d 976 (1977) (State obligated to disclose to defense evidence in possession of police officers).

Although the State acknowledges it is required to disclose information pursuant to K.S.A. 22-3212, it argues the failure to disclose the evidence was unintentional and analogizes that the late introduction of the sheriff's report and the lighter at trial is equivalent to the late disclosure of statements by witnesses prior to trial in *State v. Barncord,* 240 Kan. 35, 42, 726 P.2d 1322 (1986).

In *Barncord,* prior to trial the State became aware that the defendant and a codefendant had made incriminating statements to two witnesses. After the trial had started but before the State had put on evidence, the State notified the defense of its intent to call the two witnesses who had not been endorsed on the complaint and who had not testified at the preliminary examination. A hearing was held outside the presence of the jury to screen the witnesses testimony and allow the defendant to cross-examine the witnesses prior to their testifying before the jury. The *Barncord* court found there was nothing to indicate that the State had intentionally failed to reveal the evidence. It concluded evidence not disclosed to the defendant before trial is not sup-

pressed or withheld by the State if the defendant has personal knowledge thereof, or if the facts become available to the defendant during the trial and his defense is not prejudiced. *Barncord*, 240 Kan. at 43. See *State v. Cook*, 225 Kan. 259, 261, 589 P.2d 616 (1979); *State v. Glazer*, 223 Kan. 351, 357-78, 574 P.2d 942 (1978); *State v. Walker*, 221 Kan. 381, 383, 559 P.2d 381 (1977).

Here, defendants argue the ultimate result of the trial court's late reversal was not harmless error—the lighter was the only physical evidence that linked the defendants to the killing of Ebert. This "evidence sandbagged the joint defense." Counsel for Oden and Widener argue if they had received the report prior to April 15, 1988, they would have requested separate trials or attempted to place the blame for the killing on Burnison. Burnison claims that because of the late admission, he was unable to spend sufficient time or resources to develop an explanation for possession of the lighter. All agree the trial court's late admission of the evidence prohibited them from changing their defense strategy. Therefore, they maintain they were denied a fair trial, their convictions should be reversed, and the case should be remanded for a new trial. We disagree.

Burnison knew the cigarette lighter was in his property envelope. Discovery of the lighter in Burnison's property envelope was made known to the other two defendants on April 15, 1988. The trial started on April 18, 1988. The defendants' motion in limine to keep the prosecution from mentioning the lighter evidence in opening statement was filed and denied on April 18, 1988. It was not until April 22, 1988, that the defendants filed their motion to suppress the evidence. During those seven days the defense failed to conduct any investigation, to file a motion to suppress the evidence, or to request a continuance. Even after the defendants were aware that Ebert's lighter had been found in Burnison's property envelope, they continued their united strategy. Though the evidence was not disclosed as ordered, the State's late disclosure was not deliberate. In addition, at least one defendant had personal knowledge of the evidence. Before the trial commenced the defense was aware that the wife would testify the victim had identified all the defendants and had stated Burnison had a gun. Also, it was not until April 26, 1988, eight

days after the trial had started, that the court denied the admission of Widener's statement placing all three in the tavern when Ebert was killed.

Actual prejudice to the defendant's ability to defend against the charges must be shown in order to reverse the trial court. Prejudice is not presumed. *State v. Thompson*, 232 Kan. 364, 367, 654 P.2d 453 (1982). Improperly admitted evidence which does not prejudicially affect the substantial rights of the defendant does not require reversal when substantial justice has been done. *State v. Bell*, 239 Kan. 229, 235, 718 P. 2d 628 (1986).

Applying this rationale to the lighter evidence, the defendants must show their united strategy was actually prejudiced by the reversal of the suppression order. In light of Mrs. Ebert's identification of one of the defendants' voices during the crime, the victim's statement over the telephone identifying the defendants and implicating them in his killing, and other evidence produced at trial, the lighter evidence had little, if any, likelihood of affecting the outcome of the trial. Under the facts of this case, no actual prejudice has been shown.

## INSTRUCTIONS ON INVOLUNTARY MANSLAUGHTER

K.S.A. 21-3107(3) requires that the trial court must instruct on all lesser crimes upon which a defendant might be found guilty. A trial court must instruct the jury on the law applicable to the theories of both the prosecution and the accused when there is competent supporting evidence. *State v. Hunter*, 241 Kan. 629, 644, 740 P.2d 559 (1987); *State v. Davis*, 236 Kan. 538, Syl. ¶ 4, 694 P.2d 418 (1985); *State v. Farmer*, 212 Kan. 163, 165, 510 P.2d 180 (1973). Here, the court instructed on murder in the first degree (K.S.A. 21-3401), murder in the second degree (K.S.A. 21-3402), and voluntary manslaughter (K.S.A. 21-3403), but refused to instruct on involuntary manslaughter (K.S.A. 21-3404). Defendants claim the district court abused its discretion by not instructing the jury on involuntary manslaughter as a lesser included offense of first-degree murder when there was evidence the defendants were either voluntarily intoxicated or were attempting to collect a legal debt in an illegal manner.

The crime of involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally

in the wanton commission of an unlawful act not amounting to a felony, or in the commission of a lawful act in an unlawful or wanton manner. Involuntary manslaughter is a lesser degree of the crime of murder. *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977).

The mandatory duty of the court to instruct on a lesser included offense arises only when there is evidence upon which the accused might reasonably be convicted of the lesser offense. *State v. Royal,* 234 Kan. 218, 221, 670 P.2d 1337 (1983); *State v. Chears,* 231 Kan. 161, 165, 643 P.2d 154 (1982); *Seelke,* 221 Kan. at 675. Instructions on lesser included offenses must be given even though the evidence supporting those offenses may not be strong or extensive and consists solely of the testimony of the defendant. *State v. Hill,* 242 Kan. 68, 73, 744 P.2d 1228 (1987); *State v. Roberson,* 210 Kan. 209, 499 P.2d 1137 (1972).

The defendants argue that there was evidence to support the theory that they went to see the victim to collect a debt. We disagree. The only evidence of a debt is Widener's statement the day of the murder that a small claims action had been filed by Oden against the deceased. The theory of the defendants doing a legal act of collecting a debt in an illegal manner is without substance, is mere conjecture, and is not supported by evidence necessary to require an instruction on the lesser included offense of involuntary manslaughter. Speculation and guesswork do not constitute the minimal evidence necessary to support a conviction. *State v. White & Stewart,* 225 Kan. 87, 99, 587 P.2d 1259 (1978). Here, the trial court had no affirmative duty to instruct on involuntary manslaughter under the debt collection theory as it was not "established by the evidence." *State v. Hill,* 242 Kan. at 73; *State v. Bishop,* 240 Kan. 647, 654, 732 P.2d 765 (1987). See K.S.A. 21-3107(3).

Also, the defendants argue the jury should have been instructed on involuntary manslaughter based on defendants' intoxication. If the jury believed the defendants were voluntarily intoxicated, it could find them responsible for an unintentional killing.

The only evidence that the defendants were intoxicated was testimony by law enforcement officers that all the defendants were under the influence of alcohol. However, there was evidence that the defendants were not staggering or swaying at the time of the

arrest, all understood their *Miranda* rights, Burnison was able to drive his pickup up and down the streets, and Widener was able to give two statements, both legally admissible under *Miranda*, about the evening. The trial court found that two direct shotgun blasts into the victim, at close range, is not indicative of lack of intent. Also, there is Mrs. Ebert's testimony of Oden's statements to the victim, "[D]o you want it now" and "[G]et off the fucking phone." There is no evidence that any defendant was so intoxicated he was "utterly devoid of consciousness or awareness of what" he was doing that evening. *State v. Masqua,* 210 Kan. 419, 425, 502 P.2d 728 (1972), *cert. denied* 411 U.S. 951 (1973).

A trial court is not required to instruct on a lesser offense of the crime charged if the evidence at the trial excludes a theory of guilt on the lesser offense. *State v. Jackson,* 226 Kan. 302, 307, 597 P.2d 255, *cert. denied* 445 U.S. 952 (1979); *State v. Taylor,* 225 Kan. 788, 793, 594 P.2d 211 (1979); *State v. Blue,* 225 Kan. 576, 580, 592 P.2d 897 (1979); *State v. Trujillo,* 225 Kan. 320, Syl. ¶ 1, 590 P.2d 1027 (1979). Where there is no evidence or testimony by any of the defendants by which the jury might reasonably convict of the lesser included offense, the instruction need not be given. See *State v. Hill,* 242 Kan. at 73-77. There was no error in the trial court's refusal to instruct on involuntary manslaughter.

## CAUTIONARY VOICE IDENTIFICATION JURY INSTRUCTION

The defendants contend the jury should have received a cautionary instruction on the unreliability of "earwitness" identification of Oden's voice. They argue the jury should have been instructed to consider the length of the perception, the circumstances of the identification, the emotional state of the witness, the prior instances in which the witness had heard the defendant, and any other circumstances affecting the accuracy of the voice identification.

The defendants requested that PIK Crim. 2d 52.20, the instruction for eyewitness identification, be modified for "earwitness" identification and be given to the jury. In *State v. Warren,* 230 Kan. 385, 393, 635 P.2d 1236 (1981), we acknowledged that unreliable eyewitness identification can lead to the conviction of

innocent people. The *Warren* court described several procedures which included a cautionary instruction to the jury, to prevent the conviction of an innocent defendant because of unreliable eyewitness identification. *Warren*, 230 Kan. at 393. If "eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony." *Warren*, 230 Kan. at 397. The defense argues this cautionary instruction also applies to the voice identification.

After finding there was no extensive scientific basis that "earwitness" identification is as susceptible to the same misidentification as eyewitness identification and determining Mrs. Ebert's phone identification of Oden's voice was not critical to the State's case, the trial court refused to give the instruction. When a trial court refuses to give a specific instruction, the appellate court must view the evidence in the light most favorable to the requesting party. *State v. Hunter*, 241 Kan. at 644; *State v. Myers*, 233 Kan. 611, 616, 664 P.2d 834 (1983). The facts of this case do not raise any serious questions about the reliability of Mrs. Ebert's identification.

A witness need not be an expert in voice identification to testify as to the identity of a defendant's voice. *State v. Weigel*, 228 Kan. 194, 199, 612 P.2d 636 (1980). The defense's depiction that Mrs. Ebert could misidentify Oden's voice as she had known him only for a year is misplaced. The general rule is that a witness' testimony that she recognized the accused's voice is admissible, provided the witness has some basis for comparison of the accused's voice with the voice identified as the accused's. *Weigel*, 228 Kan. at 199.

The critical identification was the victim's identification of the defendants in the tavern just prior to the shooting. Mr. Ebert's eyewitness identification was critical to the State's case; Mrs. Ebert's voice identification only augmented the State's case. Mr. Ebert identified the three men to her. Mrs. Ebert, who had known Oden for a year, only had to identify his voice. Since Mrs. Ebert need not be a voice expert, any uncertainty as to the identification of the accused by voice recognition affects only

the weight and not the admissibility of the testimony. See *Weigel*, 228 Kan. at 199. The cross-examination of Mrs. Ebert did not weaken the reliability of her identification, nor was there any evidence offered to show the phone transmission increased the likelihood of misidentification. Under the facts of this case a cautionary instruction was not needed.

## A CONTINUANCE WHEN ADMITTING EVIDENCE PREVIOUSLY SUPPRESSED

When the court reversed its suppression order during the trial it asked the defendants if they needed a continuance. Burnison requested a continuance. A continuance may be granted to either party for good cause shown. K.S.A. 22-3401. Burnison argues he was denied the right to a complete defense by the trial court's refusal either to grant a week or even a half-day continuance so he could investigate the new cigarette lighter evidence for trial strategy.

After being allowed to examine both officers out of the jury's presence about the cigarette lighter, Burnison's counsel requested a continuance for the afternoon. The codefendants' attorneys argued against his request. The court denied Burnison a continuance but stated he would grant a recess if necessary. After Burnison had cross-examined the officers about the lighter before the jury, the court recessed to allow the defendants until the next day to prepare for cross-examination of the State's prime witness, Mrs. Ebert, about the lighter.

Burnison points out that in *State v. Corby*, 237 Kan. 387, 669 P.2d 51 (1985), we held that under the facts of that case the denial of a one-day continuance to secure the attendance of a witness was an abuse of discretion. In *Corby*, though the prosecution had used due diligence to secure the attendance of its primary witness, the trial court abused its discretion by denying the State a short continuance requested to secure the witness' attendance. *Corby* has no application to the facts of this case. Our facts are more akin to *State v. Thompson*, 232 Kan. at 368, where a juror was given until 4:30 p.m. to take care of a family problem. After the juror returned, the trial court's refusal to grant the defendant's request to continue the trial to the next day was not an abuse of discretion.

The granting of a continuance in a criminal action is entirely within the sound discretion of the trial court and its ruling will not be disturbed in the absence of showing that there has been an abuse of discretion which prejudiced the defendant's substantial rights. *State v. Thompson*, 232 Kan. 364; *State v. Nelson*, 223 Kan. 251, 573 P.2d 602 (1977); *State v. Holt*, 221 Kan. 696, 699, 561 P.2d 435 (1977); *State v. Loudermilk*, 221 Kan. 157, 162, 557 P.2d 1229 (1976); *State v. Cameron & Bentley*, 216 Kan. 644, 533 P.2d 1255 (1975).

Burnison made no attempt to investigate this evidence during the seven days prior to the introduction of evidence. The only justification Burnison gave for requesting a week's continuance was to inspect the sheriff's records and the procedures for taking possession of the lighter. His attorney did not accept the judge's offer for an in camera presentation without the prosecutor's presence to justify his request for the continuance. Careful examination of the record shows the trial court did not abuse its discretion as it allowed the defendants ample time to prepare for cross-examination of the witnesses and did not prejudice the defendants' rights by its denial of the continuance.

## REDACTED STATEMENT

Though all the defendants objected to the admission of the July 1, 1989, redacted statement at trial, on appeal only Widener argues it was improper to admit the two conflicting statements given during the July 1 interview as they differ from his statement given during the July 2, 1987, interview. Although many other courts have held the death of a defendant during the pendency of his appeal from a criminal conviction abates the appeal, in Kansas the death of a defendant does not abate his direct appeal as it is in the interest of the public that the issued raised on appeal be adjudicated upon the merits. *State v. Jones*, 220 Kan. 136, 137, 551 P.2d 801 (1976). While death moots the sentence and renders impossible a new trial, Widener's appeal as to the admitted redacted statement should be reviewed and decided.

The United States Supreme Court established the *Bruton* rule to prevent the practice of admission of "powerfully incriminating extrajudicial statements of a codefendant" who does not testify. *Bruton v. United States*, 391 U.S. 123, 135, 20 L. Ed. 2d 476,

88 S. Ct. 1620 (1968). The K.B.I. agent's testimony of Widener's July 1 redacted statement no longer implicated the codefendants or violated *Bruton*.

Only Widener is caught on the horns of the dilemma he created by giving three conflicting statements. The introduction into evidence of Widener's redacted statement is proper unless the redaction procedures distort the statement. See *State v. Purdy*, 228 Kan. 264, 271, 615 P.2d 131 (1980). We have examined the July 1 and July 2 statements in their original and redacted form. The agent's testimony of the July 1 redacted statement did not distort Widener's statement.

A redacted statement introduced into evidence by the State to show that conflicting statements were made by the declarant and not to prove the truth of matter asserted is admissible. *State v. White & Stewart*, 225 Kan. 87, 97, 587 P. 2d 1259 (1978). Here, the State offered the July 1 redacted statement to show conflicting statements were made by Widener and not to show the truth of the matter stated. The trial court properly admitted Widener's July 1 redacted statement and suppressed Widener's July 2 redacted statement which, though conflicting as to Widener, implicated the codefendants and violated *Bruton*.

The judgment of the district court is affirmed.