No. 68,211

STATE OF KANSAS, *Appellee*, v. DONALD E. WACKER, *Appellant*.

(861 P.2d 1272)

Opinion filed October 29, 1993.

*Reid T. Nelson*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with him on the brief for appellant.

*Debra S. Byrd*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals from his jury convictions of kidnapping and aiding a felon, claiming that the trial court erred in: (1) failing to suppress his statements; (2) finding there was sufficient evidence to support his convictions; (3) admitting testimony about a travel voucher and certain statements; (4) admitting a psychological report disclosed to the defendant during the trial; and (5) refusing to change venue.

Nine-year-old Nancy Shoemaker disappeared on July 30, 1990, while she was walking home from a neighborhood convenience store in Wichita. On February 18, 1991, the girl's skeletal remains were discovered in a hedgerow in a rural area near Belle Plaine. Analysis of the remains indicated death possibly occurred by strangulation or asphyxiation.

Doil Lane was the prime suspect in the murder. Police discovered a connection between Lane and defendant Donald E. Wacker when Lane told them Wacker's mother could provide him an alibi. Police learned from Wacker's mother that her son, Donald, was a friend of Doil Lane. During four different interviews, police questioned defendant in an effort to obtain information about Lane. During police interviews on July 17 and 18, 1991, Wacker gave the police information indicating he was also

involved in the crime. Wacker was charged and convicted of kidnapping and aiding a felon in the death of Shoemaker. Murder and other charges were filed against Lane. Apparently, those charges were dropped so he could be extradited to Texas to stand trial for the murder of another girl.

### Suppression of Evidence

During questioning on July 17 and 18, 1991, Wacker informed the police that he was driving down Seneca Street and at the Pawnee intersection, Lane, a passenger in the car, pointed to a girl on the south side of Pawnee. Lane told Wacker to stop the car so he could get the girl. Lane left the car and forced the girl into the car. Wacker said when he told Lane that he did not want any part of "this," Lane told him to be quiet and drive. Wacker stated he thought that Lane would kill him if he stopped. Wacker drove through Derby and stopped outside the city limits of Belle Plaine near some trees.

Lane pulled the girl out of the automobile, ripped off her clothes, and raped her. Wacker stated at one point he tried to pull Lane off of the girl, but Lane kept knocking him down. Wacker said he was unable to prevent the assault. After raping the young girl, Lane strangled her with his hands and a belt. After killing the girl, Lane put her clothes in the back of Wacker's car, and said, "Let's go." Lane later put the girl's clothing in a trash bin, and Wacker then dropped Lane off at Lane's home.

Wacker had been given the *Miranda* warnings the fifth and sixth time law enforcement officers questioned him. Before trial commenced, Wacker moved to suppress all statements, whether inculpatory or exculpatory, made prior to, at the time of, or subsequent to his arrest. The motion asserted that his statements were obtained because of his diminished educational, emotional, and mental capacities; through compulsion during secret extended periods of questioning; and by fear through the interrogators' use of threats.

In the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held the prosecution cannot use statements, whether inculpatory or exculpatory, stemming from custodial interrogation, unless it proves that procedural safeguards were used

to secure defendant's privilege against self-incrimination. These safeguards include informing the person in custody, prior to interrogation, of his Fifth Amendment rights to remain silent, to consult with an attorney, and to have an attorney present during interrogation. Further, if the person in custody states that he or she wants an attorney, all questioning must cease until the attorney is present. 384 U.S. at 445; see *State v. Leroy*, 15 Kan. App. 2d 68, 70, 803 P.2d 577 (1990).

At the hearing to suppress, the trial court found (1) during the first four interviews Wacker was neither a suspect nor in custody, therefore *Miranda* did not apply and (2) the defendant "voluntarily, freely, [and] knowingly waived his constitutional rights before talking to the police on July 17, 1991 and July 18, 1991," and it then denied the motion to suppress. On appeal, Wacker argues the trial court erred in failing to suppress his incriminating statements, claiming because his expert witness testified that Wacker was unable to appreciate the full meaning of his rights under *Miranda*, there was not substantial competent evidence to support the trial court's findings that Wacker's waiver of his *Miranda* rights was free and voluntary.

In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible shall be on the prosecution, and the required proof is by a preponderance of the evidence. When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence. *State v. Perkins*, 248 Kan. 760, 764, 811 P.2d 1142 (1991).

Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, "substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *State v. Garcia*, 250 Kan. 310, 318, 827 P.2d 727 (1992).

Wacker's expert was Dr. William S. Logan, a psychiatrist. At the suppression hearing Logan testified that Wacker could not have knowingly waived his *Miranda* rights because he had low intellectual functioning, *i.e.*, an I.Q. of 72. Dr. Logan found Wacker had difficulty utilizing information to make judgments; did not understand words such as "advise", "appoint", and "court"; and could not explain the function of an attorney. Dr. Logan concluded that in the manner in which the *Miranda* rights were presented by the police to Wacker, an understanding of those rights was beyond Wacker's intellectual capacity.

The State points to other testimony of Dr. Logan which indicates that Wacker understood his *Miranda* rights. Dr. Logan testified that when Wacker was asked about the phrase "[a]nything you say can be used against you in court," Wacker responded that meant, "They could put me in jail for the stuff I said." As to the defendant's right to have a lawyer present, Wacker said that meant, "I should have asked but I didn't." In addition, when the State had Dr. Logan read a particular portion of his notes of the interview with Wacker to the jury, Dr. Logan testified:

"I think I asked him if he could tell me what his rights were and he said a lawyer; and he said, If you couldn't afford a lawyer, the court will appoint. And I think he said, Should've said can't answer any more questions without a lawyer present. And he said, They're supposed to leave me alone. I might also add that he apparently had learned a significant amount during his period of incarceration about this as well."

The State's expert at the suppression hearing, Dr. Neil Roach, a psychiatrist, testified that in his opinion defendant knowingly and intelligently waived his rights on July 17 and 18, 1991. In support of his opinion, Dr. Roach testified Wacker understood warnings similar to the *Miranda* warnings when he informed Wacker that the interview would not be confidential. During the interview Wacker told Dr. Roach that he understood the *Miranda* rights when they were given to him by the law officers. When questioned about his constitutional rights by Dr. Roach, Wacker said "he didn't have to talk to the policeman and that he could have an attorney and if he couldn't afford one, then someone else would pay for one." Dr. Roach testified defendant "expressed the concept that he thought it would have been a good idea for

him to not talk to the policeman, consult an attorney before proceeding. In retrospect, he [Wacker] feels it would have been in his best interest to do that." Roach stated that his review of the transcripts of the police interviews with Wacker revealed no evidence that Wacker was confused.

The State also points out that: (1) Detective Leonard Moore, who spoke with the defendant on April 25 and July 12, stated, upon inquiry by the court, that the defendant "seemed to function very well in our society. . . . [H]e seemed fairly normal to me;" (2) Detective Jan McCloud did not get any indication the defendant failed to understand her when she spoke to him on April 23, 1991; (3) FBI Special Agent Daniel Jablonski testified that on July 17, 1991, he went over each statement on the *Miranda* rights form with the defendant line by line and the defendant indicated he understood each right. Defendant did not ask for clarification of any of the rights but appeared to understand the rights as stated; (4) Detective Clint Snyder, on July 18, 1991, went over the *Miranda* rights with the defendant in serial fashion and defendant indicated he understood each right and Snyder believed Wacker understood; and (5) Steven Davis, a clinical psychologist with the Sedgwick County Department of Mental Health, who interviewed and tested the defendant in connection with a competency evaluation, testified defendant appeared to understand the purpose of the competency evaluation and the concepts of court and attorney.

After reviewing the record we find there is substantial competent evidence to support the trial court's conclusion that Wacker voluntarily, freely, and knowingly waived his *Miranda* rights.

## Sufficiency of the Evidence

Defendant next contends there was insufficient evidence upon which a rational factfinder could find him guilty of kidnapping or aiding a felon beyond a reasonable doubt. When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty

beyond a reasonable doubt. *State v. Evans*, 251 Kan. 132, Syl. ¶ 1, 834 P.2d 335 (1992).

Defendant fails to brief this issue insofar as it relates to the conviction for aiding a felon. An issue which is not briefed is deemed abandoned. *State v. Gardner*, 10 Kan. App. 2d 408, 413, 701 P.2d 703, *rev. denied* 237 Kan. 888 (1985). The only issue we will consider is the sufficiency of the evidence as to the kidnapping conviction.

Wacker was found guilty of kidnapping, a violation of K.S.A. 21-3420(b), by unlawfully and willfully taking or confining Nancy L. Shoemaker, by force or threat, with the intent to hold her to facilitate the commission of the crimes of battery, indecent liberties with a child, or rape. Defendant contends that his conviction of kidnapping rests solely upon his "unreliable confession" that he and Doil Lane picked up Nancy Shoemaker and drove her to a remote area where Lane killed her. Wacker acknowledges that when applying the appropriate standard of appellate review, even though his confession was unreliable, standing alone, that is not sufficient to overturn his conviction. To overturn his conviction, defendant argues that his employment time card proves that he was at work during the time the murder took place; therefore, even though he confessed, he could not be guilty of the kidnapping because it was factually impossible for him to have participated in the crime.

Wacker presented evidence that it took one and one-half hours to drive to the crime scene and back to Wichita. Wacker's time card shows that he had clocked in at work at 7:32 a.m., out at 2:14 p.m., in at 2:45 p.m., and out at 7:32 p.m. Although the entries on defendant's time card indicate he was working during the time the murder took place, the time card does not show he was always present on the employer's premises during that time.

Defendant told law enforcement officials he picked Doil Lane up around 8:00 a.m. and that they were going to Haysville to pick up inserts for Pennypower, his employer, when Nancy Shoemaker was abducted. A second indication that Wacker left his employer's premises is an expense voucher turned in by Wacker stating he was away from his work place "getting propane and running Pennypower shortages" on July 30, 1990. This evidence was consistent with information authorities received from Wack-

er's employer that Wacker would leave work to run errands. Contrary to defendant's arguments, the time card does not exonerate him.

## Hearsay

Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible unless it falls within one of the recognized exceptions to the rule against admission. K.S.A. 1992 Supp. 60-460. A statement includes oral and written expressions and nonverbal conduct of a person intended as a substitute for words expressing the matter stated. K.S.A. 60-459(a).

The Travel Voucher. Over Wacker's objection, on redirect the State contradicted Wacker's claim that he was at work by the testimony of Detective Clint Snyder:

"Q:  [By Ms. Barnett] Did you have an opportunity to learn anything about the defendant's whereabouts on July 30, 1990, with regard to his work?

"A:  Yes.

"Q:  What did you learn?

"A:  We learned that he had turned in a—or his expense voucher for that week indicated that he had turned in for 45 miles, and that he had indicated that he was getting propane and running Pennypower shortages sometime during that day."

Wacker argues that even though his attorney had previously opened this area by questions asked during cross-examination, the issue on appeal is whether the evidence is inadmissible as hearsay. Defendant argues the statement was inadmissible because it was made by someone from Pennypower to Detective Moore, who told Detective Snyder, who testified about the statement at trial. Defendant points out that although Detective Moore was available at trial, the person from Pennypower who made the statement was not present. Defendant asserts there is no exception to the hearsay rule, K.S.A. 1992 Supp. 60-460, which allows the statement into evidence.

The State responds that when evidence is introduced by defense counsel on cross-examination, the defendant cannot subsequently claim the trial court improperly admitted hearsay evidence. We agree. In *State v. Chatmon*, 234 Kan. 197, Syl.

¶ 4, 671 P.2d 531 (1983), this court recognized that when the defendant opens a subject on direct or cross-examination of a witness, the State may develop and explore various phases of that subject even though the witness' testimony could have been excluded as hearsay prior to the defendant's opening the subject. A party who introduces hearsay evidence into the trial cannot later claim on appeal that the hearsay evidence should have been excluded.

Statements attributed to Doil Lane. Detective Snyder testified that during the first four interviews Wacker informed officers that Lane had told him that (1) Lane had Nancy Shoemaker and that he was headed somewhere down south with her; (2) Lane had sex with children and wore children's underwear; and (3) Lane had sexual intercourse with Nancy Shoemaker. On appeal, defendant asserts these statements made by Doil Lane, who was never a witness, prove that Doil Lane had kidnapped and raped Nancy Shoemaker. Defendant argues that although the statements he made to the officer were admissible, Wacker's statements of what Doil Lane told him were hearsay and, therefore, not admissible. We disagree with Wacker's conclusion that certain portions of his statements to the officers were inadmissible under K.S.A. 1992 Supp. 60-460.

In addition, the record shows that in arguing the admissibility of this evidence, the prosecutor pointed out that the defendant's statements changed over time and stated, "We are not offering the statements of Doil Lane. In fact, we do not necessarily contend that Doil Lane made these phone calls to the defendant. We are merely offering the statements of the defendant to show the course of the investigation, conversations he had with the detective and how his statements changed over a very short period of time. . . . [I]t just isn't hearsay in the sense of hearsay. It is not a statement of Doil Lane being offered for the truth of the matter asserted."

The statutory definition of hearsay is an out of court statement offered to prove the truth of the matter asserted. K.S.A. 1992 Supp. 60-460. Lane's statements to the defendant were not being offered for the truth of the matter asserted. The jury was informed that the statements were being offered by the State to show how Wacker had changed his story to law enforcement officials. There

was no error in the admission of this evidence. See *State v. Hall*, 220 Kan. 712, Syl. ¶ 5, 556 P.2d 413 (1976).

Finally, Wacker claims that the trial court improperly admitted hearsay testimony during cross-examination of Detective Snyder. When defendant's attorney asked the officer why he believed Wacker's statement was reliable, the officer answered that it was consistent with Lane's statement. Defendant complains that Detective Snyder improperly bolstered Wacker's unreliable confession with hearsay statements of Lane by telling the jury he believed that the statements made by Wacker were reliable because they were consistent with previous statements made by Doil Lane.

When the defendant elicits unfavorable testimony during cross-examination, the defendant may not complain that the testimony was inadmissible under the statutory prohibition against the introduction of hearsay into evidence. *Chatmon*, 234 Kan. at 203.

## The Psychological Report

Wacker notes that although he had been granted discovery, it was not until the sixth day of trial that his attorney received the report of Dr. Tamara Pryor which had been used by the State's expert witness, Dr. Roach, to form his opinion that Wacker was not retarded and understood statements he made to the officers could be used against him. Wacker asserts that his counsel, after being told by the prosecutor to go to Charter Hospital to obtain reports, made numerous trips to the hospital and had been informed he had everything, but had not received Dr. Pryor's report. Defendant states that his counsel was "apparently allowed to read the report shortly before Dr. Roach's testimony."

When defense counsel objected to the use of the report by the State and its witness, the trial court noted:

"Well, this report is clearly of a nature that is subject to discovery. I will find that the report was prepared on March the 18th, 1992. We began the trial of this case on March the 30th, 1992. Counsel for the State has indicated to the Court that on the first or second day of trial arrangements were made for defense counsel or someone working under his supervision to go to Charter Hospital where all of these records were maintained and kept; and under these circumstances, I find that there has been no violation by the State of a continuing discovery request; and in fact, the State has endeavored to make . . . all of the required documents available to [defense counsel],

so—I guess if it's an objection to Dr. Roach's testimony that you're asking me to consider because of the failure to provide a copy of the Pryor report . . . that objection is overruled. . . . Let me just say that I think what I understood [the prosecutor] to say is that while it's true she has not personally handed this report of Tamara Pryor to you, in lieu of that she has proffered access to Charter Hospital to defense counsel or his assistant."

Defendant points out that during cross-examination, Dr. Roach admitted that he relied upon results from Pryor's report to form his expert opinion that Wacker understood his rights when he confessed to the police officer. Defendant claims that the report contains valuable impeachment and substantive evidence. Defendant argues his defense was prejudiced because his attorney did not have the report prior to trial. Wacker concludes that the hospital's failure to turn over the report is imputed to the prosecutor, and defendant must be given a new trial.

In response the State notes that trial commenced on March 30, 1992. On April 6, 1992, when she received it, the prosecutor gave defense counsel a copy of Tamara Pryor's report. The State asserts that there is no evidence that the prosecutor intentionally failed to reveal Pryor's report to defense counsel. The State notes that defense counsel obtained Pryor's report the same day the prosecutor did. The State points out that although defense counsel had not received Pryor's report, counsel had been given the results of three tests performed by Pryor on March 31, 1991. Before Dr. Roach testified at trial, defense counsel was given an hour and one-half to review the report to prepare for cross-examination. Defense counsel gave the report to Dr. Logan, defendant's expert, for his review prior to Dr. Logan's testimony, which was subsequent to Dr. Roach's testimony.

In *State v. Burnison*, 247 Kan. 19, 795 P.2d 32 (1990), we noted that in a criminal case, evidence not disclosed to the defendant before trial is not suppressed or withheld by the State if the defendant has personal knowledge thereof or if the facts become available to him during trial and he is not prejudiced in defending against them. 247 Kan. 19, Syl. ¶ 1. Actual prejudice to the defendant's ability to defend against the charges must be shown in order to reverse the trial court. Prejudice is not presumed. 247 Kan. at 27. Here, the defendant has not shown actual prejudice and this issue is without merit.

## Change of Venue

On February 7, 1992, approximately seven weeks prior to commencement of his trial, Wacker filed a motion for change of venue. The motion alleged that (1) extensive media coverage in Sedgwick County had focused on defendant's case; (2) repetition of the allegations against Wacker could be anticipated both prior to jury selection and during the trial; and (3) due to the media coverage, "there exists in this county a great prejudice against the defendant that he cannot obtain a fair and impartial trial in this county." In support of the allegations, two newspaper articles were appended to the motion; one article was dated July 24, 1991 (more than 6 months prior to the filing of the motion to change venue) and the other appeared in the newspaper on October 17, 1991 (more than 3 months before the filing of the motion).

The hearing on the motion for change of venue was held prior to the selection of the jury. In addition to the information contained in his motion, Wacker called one witness. The witness testified that she knew the defendant was involved in the kidnapping and murder of Nancy Shoemaker from the news, newspaper, flyers, and discussions with other people. The witness stated in her opinion the defendant was guilty. She knew five to seven other individuals in the community who shared her views. The witness admitted she was not able to speak for the community at large.

In denying the motion to change venue, the judge noted "that what is important is whether or not in the jury selection process twelve fair and impartial jurors can be selected." The court noted the two articles and pointed out the lack of recent articles concerning the crime. The court denied the motion "without prejudice to renewing during the jury selection process." The defendant did not renew the motion after the jury had been selected.

Because of the pretrial publicity of the murder, Wacker contends the trial court erred in failing to grant his motion for change of venue. He argues that news media treatment and coverage of the crime was and would be so extensive that justice required the trial be moved to a different area of Kansas.

The determination of whether to change venue lies within the sound discretion of the trial court and that determination will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant, with the burden upon the defendant to show prejudice in the community, not as a matter of speculation, but as a demonstrable reality. To show prejudice to the substantial rights of the defendant, there must be more than speculation that the defendant did not receive a fair trial. The State is not required to produce evidence refuting that of the defendant. *State v. Lumbrera*, 252 Kan. 54, Syl. ¶¶ 2, 3, 845 P.2d 609 (1992).

Obviously, there was an enormous amount of publicity concerning the murder in the area. Unfortunately, there was no place in this state that the facts of the murder and the arrest of the defendant were not known. Modern communication and network methods for distribution of news allow the news media to distribute information by newspaper, radio, and television to the public statewide. News of the murder and the investigation was not, nor could it be, limited to the Wichita area. Because of the disappearance and tragic murder of the young girl, the news of that happening was immediately spread throughout Kansas as each fact surrounding her disappearance and death was uncovered.

Indicative of whether the atmosphere is such that a defendant's right to a fair and impartial trial would be jeopardized, courts have looked at such factors as: the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated in other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effect, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of a jury, both those peremptory and those for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. Annot., 33 A.L.R.3d 17,

§ 2(a). See *State v. Ruebke*, 240 Kan. 493, 499-500, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

Media publicity alone has never established prejudice per se. The defendant had the opportunity to renew his motion after the jury was selected and did not do so. The trial court had no difficulty in finding jurors who stated that they could render a fair and impartial verdict. A reading of the transcript of the hearing on the motion for change of venue shows the defendant did not meet his burden to show that the substantial rights of the defendant to a fair trial were substantially prejudiced by pretrial publicity. Wacker's contention that he did not receive a fair trial because of pretrial publicity is based on speculation. The trial court did not abuse its discretion in denying the motion for change of venue.

Affirmed.