No. 74,582

STATE OF KANSAS, *Appellee*, v. ROBERT AIKINS, *Appellant*.

932 P.2d 408

348

 Opinion
filed January 24, 1997. 

*Joseph L. Dioszeghy*, of Overland Park, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Carla J. Stovall*, attorney general, *Paul J. Morrison*, district attorney, and *Donald W. Hymer, Jr.*, assistant district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Robert Aikins, from his convictions of aggravated robbery and felony murder. Aikins was sentenced to life in prison for felony murder and given a concurrent sentence of 206 months in prison for the aggravated robbery conviction. Aikins and a co-participant, Sheldon K. Nash, were both age 18 when the crimes occurred. Aikins and Nash were tried together. Nash's appeal is also decided this day. In his individual appeal, Aikins raises 10 issues.

When viewed as we are required to view it, the evidence is that Aikins, Nash, Damon McGlory, and Paula Hopson lived together in Aikins' studio apartment in Olathe, Kansas. Aikins owned a white two-door Ford Escort. None of the others owned or had access to a car.

Aikins was originally from Parsons, Kansas. Over the 1994 Labor Day weekend, Aikins, Nash, and McGlory went to Parsons. When they returned to Olathe, Terrance Kelly (age 14), also known as T-Money, accompanied them. Kelly brought a sawed-off shotgun with him. Throughout the day of September 7, the four roommates, Kelly, and McGlory's girlfriend, Jessica Smith, "hung out" together in Aikins' apartment. At some point during the day, some members of the group went to Martin's Liquor Store, but the clerk refused to sell them alcohol because they did not have any identification indicating that they were 21 years of age. Later in the night, around 10 p.m., the group, except for Paula Hopson, left in Aikins' car to take Smith home and to rob a liquor store. Aikins drove the group in his car and Kelly brought his shotgun. The group stopped at a liquor store, but decided it was too well-lit and left. The group stopped at a second liquor store, but it was closed.

Finally, the group stopped at Martin's Liquor Store, which was located in a strip mall, and Aikins parked the car next to the strip mall with the lights toward the street. Kelly walked to the liquor store with the gun hidden in his clothes. Kelly wore shorts, a shirt, a dark ball cap, and two bandannas. Kelly walked into the store, started throwing things around, took some money, and shot and killed Gene Martin. Kelly returned to the car and the group drove away. Kelly threw the shotgun in the back seat, and it hit Smith in the eye. The group returned to Aikins' apartment, and eventually Smith was taken home.

At trial, the State argued that Aikins and Nash aided and abetted the aggravated robbery and thus were guilty of aggravated robbery. Further, the State argued that Martin was killed during the course of this aggravated robbery, making Aikins and Nash guilty of felony murder. In his defense, Aikins testified that he did not know Terrance Kelly had brought a gun with him to Olathe from Parsons. Aikins testified that he did not know the group had discussed robbing a liquor store during the day of the robbery. He testified that he did not know Kelly had brought his gun with him when the group got in the car to take Smith home. Aikins further testified that he did not know Kelly had taken the gun into the liquor store with him, nor did he know that Kelly planned to rob the store. Thus, Aikins argued that he did not have the requisite intent to aid and abet an aggravated robbery and could not be guilty of such crime. Since he could not be guilty of aggravated robbery, Aikins argues, he could not be guilty of felony murder.

The jury found both Aikins and Nash guilty of aggravated robbery and felony murder.

## POST-ARREST STATEMENT

The day after Martin was murdered, Aikins was arrested without a warrant. Upon his arrest, the police read him his *Miranda* rights, and he waived these rights. He then gave a statement to the police which was tape-recorded. In this statement, Aikins lied to the police by telling them that T-Money and Terrance Kelly were two different people. When the police confronted Aikins with the fact that T-Money and Kelly were the same person, Aikins responded

by stating, "I wondered how long it would take you to figure that out." Also in this statement, Aikins told the police that he did not know where the gun was which had been used in the robbery and murder. Later, Aikins told the police that he did know where the gun was. He voluntarily showed the police where the gun had been thrown out of the car, and the police recovered the gun. In this statement, Aikins also told the police that he was not aware that Kelly had a gun or that Kelly was going to rob the liquor store. Aikins claimed the group went to the liquor store to buy liquor. He stated that he parked the car at the end of the strip mall so that the owner would not be able to see that the car was full of young people and refuse to sell Kelly any alcohol.

Prior to trial, Aikins filed a motion to suppress his post-arrest statement, alleging that it was the fruit of an illegal arrest which lacked probable cause. In an effort to demonstrate that probable cause existed to arrest Aikins and that his subsequent statement was not the fruit of an illegal arrest, the State called Roger T. LaRue as a witness in the suppression hearing. LaRue testified that he had been a police detective with the Olathe Police Department for 23 years. LaRue was involved in investigating the death of Martin as a detective for the City of Olathe and as the lead investigator for the Metro Squad.

LaRue testified that before Aikins was arrested, the police were aware of a witness, Karen Carpenter, who had seen part of the robbery. Carpenter described the vehicle that she believed was involved in the robbery as a small white car. She saw several people in the car, and she saw one individual leave the car and go into the liquor store immediately before the homicide occurred.

LaRue also testified that the police received a phone call from Wynona Hopson before Aikins was arrested. Wynona Hopson's daughter, Paula Hopson, was one of the roommates who lived in Aikins' studio apartment. Wynona Hopson brought her daughter to the police station. LaRue interviewed Paula. Paula said she was living with Aikins and Nash and that other people were also staying in the apartment. Paula explained that six people got in a small white Ford—Robbie Aikins, Sheldon Nash, Damon McGlory, Jessica Smith, T-Money, and herself. Paula told LaRue that Aikins

owned the car and drove the car during the robbery. LaRue testified that Paula told him the group drove to Martin's Liquor Store and that they all went in to buy alcohol except for Paula. While in the store, T-Money shot Martin with a shotgun. Paula told LaRue that they all went back to Aikins' apartment after the shooting. Paula gave the officers the correct address of the apartment.

Paula also told LaRue that T-Money wore two bandannas when he robbed the store. Two bandannas were recovered at the scene of the murder. LaRue testified that Paula told him T-Money wore a black baseball cap embroidered with the words "Thug Life." Such a hat was found outside the liquor store. Paula also told LaRue that T-Money threw the gun in the back seat when he got in the car and that it struck Jessica Smith in the eye, giving her a bruise. According to LaRue, this statement turned out to be true. The police had not previously told Paula any of these facts. LaRue testified that, according to Karen Carpenter's and Paula Hopson's statements, the police had consistent information that Aikins was driving the car when the robbery and murder occurred and that some of the people involved in the murder were staying with Aikins. According to the State, this gave the police probable cause to arrest Aikins.

However, on cross-examination of LaRue at the suppression hearing, the defense questioned LaRue about the police report which stated that Wynona Hopson quoted her daughter Paula as saying, "Mama, we didn't go to kill no one. T-Money did that. Nobody knew that was going to happen." According to the police report and LaRue's testimony, Paula also told her mother, "Mama, when I got back in the car, all I could see was blood." Paula told her mother that she, Smith, Aikins, T-Money, and a black male she did not know all went into the liquor store to buy beer. The liquor store did not have the beer they were requesting, and they all returned to the car except for T-Money. Paula then heard a gunshot and saw T-Money running back to the car. LaRue testified that Paula told her mother that the group did not go to the liquor store to rob or kill anybody. LaRue admitted on cross-examination that Wynona's version of what happened, according to what Paula told her, is inconsistent with Karen Carpenter's statement that only

one person from the car went into the store. However, LaRue said that at this time in the murder investigation, the police were still trying to put all the pieces of the crimes together.

LaRue also testified that, in second interview, Paula admitted she had been lying to the police. According to Paula's revised version of the facts, she had not been in the vehicle when the crimes occurred. Instead, she had been at Aikins' apartment and was there when Aikins, Nash, T-Money, and Smith returned from the liquor store. LaRue testified that Paula told him that when the group returned from the liquor store, Smith had a black eye and T-Money began counting the stolen money. The group then told Paula about the robbery and murder.

LaRue testified that Paula had initially lied because she did not think the police would believe her story if she did not say she had been in the car when the murder occurred. Paula wanted the police to believe her story because Paula's cousin, who had been seen at Martin's Liquor Store in a white car on the night of the murder, was a suspect in the crimes. Paula came forward because she wanted the police to know that T-Money, and not her cousin, had shot Martin.

LaRue testified that he told the other officers about the information he had received from Paula. At this time, the apartment building that Aikins lived in was placed under surveillance. LaRue was concerned that Aikins and the others might flee the area. LaRue testified that the white car showed up at the apartment building with Aikins, Nash, and Kelly in it, and the three were arrested.

The trial court held that Aikins' statement was not the fruit of an illegal arrest because the arrest was proper in that the police had probable cause to arrest him. In so holding, the court stated:

"I believe that there was probable cause to make the arrest of Mr. Aikins at the time the arrest was made. It's true there turned out to be not only inconsistencies in the information that they received from Paula Hopson via her mother, Wynona, and from Paula Hopson directly, but the one consistency, I believe, that furnished probable cause for the arrest was the participation by Mr. Aikins as the driver."

Aikins appeals the district court's finding that the police had probable cause to arrest him and the court's refusal to suppress his post-arrest statement as the fruit of an illegal arrest.

"When reviewing a trial court's suppression of evidence, the appellate courts normally give great deference to the factual findings of the trial court. The ultimate determination of the trial court's suppression of evidence is a legal question requiring independent appellate determination." *State v. Vandiver*, 257 Kan. 53, Syl. ¶ 6, 891 P.2d 350 (1995).

A law enforcement officer may arrest a person without an arrest warrant if the officer has probable cause to believe that the person has committed a felony. K.S.A. 22-2401(c)(1).

"If a warrantless arrest is challenged by a defendant, the burden is on the State to justify the arrest was not only authorized by the statute, but that it was permissible under the Fourth Amendment of the United States Constitution. The constitutional validity of a warrantless arrest depends upon whether the arresting officer had probable cause to believe that the person arrested had committed a felony." *State v. Strauch*, 239 Kan. 203, Syl. ¶ 1, 718 P.2d 613 (1986).

"Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. It does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt." *State v. Grissom*, 251 Kan. 851, Syl. ¶ 22, 840 P.2d 1142 (1992).

"Probable cause for arrest without a warrant depends upon the probabilities arising from known facts and circumstances and exists when the practical considerations of everyday life would lead a reasonable and prudent officer to believe a felony has been or is being committed." *State v. Brocato*, 222 Kan. 201, Syl. ¶ 1, 563 P.2d 470 (1977).

"It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove guilt is more probable than not. It is only necessary the evidence lead the officer to believe that guilt is more than a possibility, and it is well-established that the belief may be predicated in part upon hearsay information." *State v. Curtis*, 217 Kan. 717, Syl. ¶ 1, 538 P.2d 1383 (1975).

We hold the State had probable cause to arrest Aikins. Karen Carpenter saw a car, fitting the description of Aikins' car, pull up to the side of the strip mall where the liquor store was located. She saw a person go into the liquor store and come running out. This person jumped into the car, and the car drove off. Paula Hopson gave a similar description of the defendant's car and stated that this was the car used in the aggravated robbery and murder. Both Paula and her mother provided the police with information indicating that the apartment in which the actual triggerman was staying in was rented in Aikins' name.

It is true that Paula's statement contained lies and inconsistencies. However, many of Paula's statements were confirmed. Further, Paula was an ordinary citizen who had come forward, with her mother's help, in concern for society and her own safety. She was not a regular police informant who expected gain from her statement. See *State v. Walters*, 8 Kan. App. 2d 237, 238, 655 P.2d 947 (1982) ("[S]tatements of citizen informers are not viewed with such rigid scrutiny as the testimony of a police informer."), *rev. denied* 232 Kan. 876 (1983).

It is also true that almost all of Paula's truthful statements and those of her mother were hearsay. However, it is well established that probable cause may be supported in part by hearsay information. *Curtis*, 217 Kan. 717, Syl. ¶ 1. Aikins contends that, in this case, the police based their probable cause finding *entirely* on hearsay, not just in part. This is not the case. While the police did support their probable cause finding with Paula's hearsay statements and with her mother's hearsay statements, they also supported their probable cause finding on the direct evidence of Karen Carpenter.

Finally, "[t]wo other factors which may come into play in evaluating police conduct in making a warrantless arrest are: the seriousness of the alleged offense and the exigency of the situation, as where immediate arrest seems desirable because of the likelihood that the suspect will flee the jurisdiction." *State v. Niblock*, 230 Kan. 156, 161, 631 P.2d 661 (1981). In this case, the alleged offenses were very serious—first-degree felony murder and aggravated robbery. Also, LaRue testified at the suppression hearing that he was afraid Aikins would flee the area. Thus, immediate arrest seemed desirable.

It is true, as Aikins argues, that the police did not have any evidence prior to his arrest that he had planned the robbery or had knowledge of it before it occurred. However, probable cause "does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt." *Grissom*, 251 Kan. 851, Syl. ¶ 22. It was reasonable for the officers to make a "fair inference," based on the evidence they had, that Aikins knew about the aggravated robbery beforehand or at least

knew he was harboring felons after the murder. See *Strauch*, 239 Kan. at 209 ("In determining whether probable cause to arrest exists, all the information in the officer's possession, *fair inferences therefrom*, and facts may be taken into consideration that might not be admissible on the issue of guilt.").

Thus, based on the known facts and circumstances that the officers had, the practical considerations of everyday life would lead a prudent person to believe that Aikins had committed a felony. *Brocato*, 222 Kan. 201, Syl. ¶ 1. This evidence alone could not have proven the defendant's guilt beyond a reasonable doubt or even proven the defendant's guilt was more probable than not, but it could have reasonably led an officer to believe that the defendant's guilt was more than a possibility. *Curtis*, 217 Kan. 717, Syl. ¶ 1. As such, the police officers had probable cause to arrest Aikins, and the warrantless arrest was legal. K.S.A. 22-2401(c)(1). Since the arrest was legal, Aikins' subsequent statement was not the fruit of an improper arrest, and the trial court properly denied Aikins' motion to suppress the statement.

## CONSOLIDATION

Aikins and Nash were each charged in a separate complaint with the crimes of aggravated robbery and felony murder. Prior to trial, the State filed a motion to consolidate the cases and try them together. Nash did not object to the consolidation, but Aikins did. After hearing argument, the court ordered the State not to introduce any evidence of Nash's gang activities which might prejudice Aikins. Having done this, the court ruled that there was no reason not to try the cases together because the defendants would not be prejudiced by consolidation and because it would create judicial economy. Using a reverse analogy, the court reasoned that if the defendants had been charged together, it would not have been compelled to grant separate trials. Thus, the court ruled that, under K.S.A. 22-3204, it was proper to consolidate the cases even though the defendants were charged separately.

K.S.A. 22-3202(3) provides:

"Two or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction

or in the same series of acts or transactions constituting the crime or crimes. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

K.S.A. 32-3204 provides:

"When two or more defendants are jointly charged with any crime. the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney."

Aikins contends that these statutes do not apply because Aikins and Nash were not charged together in the same complaint. As such, Aikins takes issue with the trial court's analogy between 22-3204 and the present situation. According to Aikins, just because a court is authorized by 22-3204 to sever the trials of two defendants who are charged together, this does not mean the court has the power to consolidate the trial of two defendants who were charged in separate complaints, without the specific authorization of a statute.

Aikins properly points out that no statute authorizing such consolidation exists. However, Aikins is mistaken in his argument. Under Kansas case law, a trial judge may use his or her inherent authority and join or consolidate two defendants for trial, even if the defendants were charged in separate complaints, if the defendants could have been charged together in one complaint. Thus, "[t]he test for joinder of two or more cases for trial is the same as that for charging two or more defendants in the same complaint, information or indictment." *State v. Tate*, 228 Kan. 752, 753, 620 P.2d 326 (1980). See *State v. Hunter*, 241 Kan. 629, 632-33, 740 P.2d 559 (1987) ("Two or more defendants, charged in separate complaints or informations which allege that the defendants have participated in the same act or acts, may be later joined for trial if the defendants could have been charged in the same complaint, information or indictment."); see also *State v. Coe*, 223 Kan. 153, 157-58, 574 P.2d 929 (1977) ("Although 22-3204 . . . is silent concerning the power of the trial court to consolidate trials on the motion of one or more of the defendants, the trial court has such inherent authority.").

Several defendants may be joined together in one trial, even if they were not in fact charged together in one complaint, in the following circumstances:

"(1) when each of the defendants is charged with accountability for each offense included, or (2) when each of the defendants is charged with conspiracy and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy, or (3) when in the absence of a conspiracy it is alleged the several offenses charged were part of a common scheme or were so closely connected in time, place and occasion that proof of one charge would require proof of the others." *Tate*, 228 Kan. at 754; see *State v. Martin*, 234 Kan. 548, 549, 673 P.2d 104 (1983).

The determination of whether two defendants could have been charged together in the same complaint and thus tried together, even though the defendants were actually charged in separate complaints, is in the trial court's discretion. *Tate*, 228 Kan. at 753. Thus, the trial court's decision to try Aikins and Nash together because they could have been charged in the same complaint, even though they were actually charged in separate complaints, is reviewed by an abuse of discretion standard.

Under K.S.A. 22-3202(3), Aikins and Nash are alleged to have participated in the same series of acts or transactions constituting the crimes. Both are alleged to have participated in planning the robbery on the drive back to Olathe from Parsons and during the day of the robbery. Both are alleged to have accompanied Terrance Kelly in the white Ford Escort to the liquor store. Both waited in the car while Kelly walked into the liquor store, robbed it, and killed the owner, and both drove off with Kelly in the car after the crimes were committed. Further, pursuant to *Tate*, each defendant is charged with accountability for each offense of aggravated robbery and felony murder. Each is charged with criminal responsibility for aggravated robbery because each allegedly aided and abetted such crime, and each is charged with felony murder because a foreseeable killing occurred in the midst of an inherently dangerous felony.

Thus, Aikins and Nash could have been charged together in one complaint, even though they were not. Because of this, Aikins' and Nash's cases could have been properly joined together in one trial.

However, even though the requirements of joinder are technically satisfied, the court should not join two defendants in one trial if either defendant will be prejudiced by the joinder. *Martin*, 234 Kan. at 549. " '[A]lthough a single trial may be desirable from the standpoint of economical and efficient criminal procedure, the right of a defendant to a fair trial must be the overriding consideration.' " *Martin*, 234 Kan. at 550 (quoting *State v. Sully*, 219 Kan. 222, 224, 547 P.2d 344 [1976]). A court should sever the trials (or never join them) "to avoid prejudice and ensure a fair trial to each defendant." *State v. Myrick & Nelms*, 228 Kan. 406, 415, 616 P.2d 1066 (1980).

In order for a trial court to conduct separate trials for defendants who could be joined together in one complaint and trial, *actual prejudice* stemming from a joint trial must be shown. See *State v. Pham*, 234 Kan. 649, 653, 675 P.2d 848 (1984). The usual grounds to show prejudice so that severance (or nonjoinder) will be granted are as follows:

"(1) the defendants have antagonistic defenses; (2) important evidence in favor of one of the defendants which would be admissible in a separate trial would not be allowed in a joint trial; (3) evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants." *Pham*, 234 Kan. 649, Syl. ¶ 2.

Accord *Hunter*, 241 Kan. at 633; *State v. Holley*, 238 Kan. 501, 507-08, 712 P.2d 1214 (1986); *Martin*, 234 Kan. at 549; *Myrick & Nelms*, 228 Kan. at 416.

Aikins argues that actual prejudice did occur as a result of the consolidation of his trial with Nash's trial for three reasons. First, under factor 1, Aikins asserts that he and his codefendant, Nash, had antagonistic defenses. Second, similar to factor 4, Aikins argues that evidence which the State introduced to prove its case against Nash was prejudicial to Aikins. This evidence included a statement attributed to Nash that there "was too much light" at the first liquor store, indicating that it was not a good store to rob. Further, the

State introduced evidence that Nash asked "who talked" after he was arrested. Finally, Aikins argues that references regarding Nash's participation in a gang were mentioned at trial. Aikins contends that all of this evidence the State presented to prove its case against Nash was prejudicial to him. Third, under factor 5, Aikins contends that Nash could have been compelled to testify on Aikins' behalf if Aikins had received a separate trial. This did not occur in the joint trial because Nash had a right not to take the stand and testify on Aikins' behalf because Nash's testimony might have implicated him as a participant in the crime. According to the defense, if Nash had been compelled to testify on Aikins' behalf at Aikins' separate trial, Nash's testimony would have supported Aikins' story that Aikins did not know a robbery was planned or was going to occur when Aikins drove the group to the liquor store. For these three reasons, Aikins contends he experienced actual prejudice as a result of the joint trial. Aikins asserts that the trial court placed the concerns of judicial economy and convenience over his right to receive a fair trial. As such, Aikins asks this court to reverse the jury verdict and grant him a new, separate trial.

Aikins' first contention, that he and codefendant Nash had antagonistic defenses, has no merit. "[A] mere allegation of antagonistic defenses . . . is not enough." *Pham*, 234 Kan. at 654. Antagonistic defenses occur when "each defendant is attempting to convict the other" or "the defenses conflict to the point of being irreconcilable and mutually exclusive." *State v. Anthony*, 257 Kan. 1003, 1018, 898 P.2d 1109 (1995). However, a mere inconsistency in trial strategy does not constitute an antagonistic defense. "Before defenses of codefendants will be declared antagonistic there must be a dichotomy, or near dichotomy, between the defenses. The classic example of intrinsically antagonistic defenses is where both defendants blame each other for the crime while attempting to defend against the State's case." *Pham*, 234 Kan. at 655.

In *Anthony*, all three codefendants relied on alibi defenses that were not mutually exclusive. This court did not find these defenses to be antagonistic. 257 Kan. at 1018. In *Myrick & Nelms*, 228 Kan. at 416, this court analyzed the defendants' defenses to determine if they were antagonistic:

"Both defendants were charged with the same offenses, arising out of the same transaction, and both were convicted. [One defendant] accused [the second defendant] of killing Trooper O'Brien and [the second defendant] relied on the testimony of [a third participant] which was inculpatory to both defendants. Proof of who was the triggerman was immaterial. [The defendants] were together in the commission of the crime and both were properly charged as principals. Their defenses placed both defendants at the scene; both possessed weapons; both fled from the scene in [one defendant's car] with [that defendant] driving and both participated in the gun battle . . . ."

Based on the facts of the case and defenses offered, this court did not find that the defenses were antagonistic.

In this case, both Aikins and Nash were tried as aiders and abettors in the aggravated robbery. Neither was tried as a principal, and neither tried to present evidence to convict the other as the principal. Neither Aikins nor Nash presented evidence on his own behalf which implicated the other. Neither Aikins nor Nash cross-examined a witness in an attempt to show that the other defendant was the guilty one. Here, both defendants presented consistent defenses that a third person was the guilty one. There was no irreconcilable and mutually exclusive dichotomy between Aikins' and Nash's defenses. In fact, their defenses were consistent and seemed to support each other. Both codefendants argued that Terrance Kelly was a wild person and that they had no prior knowledge that Kelly was going to commit a robbery. This defense would have seemed implausible if everyone in the car knew about the robbery except for the driver—Aikins. With Aikins and Nash both alleging this defense of no knowledge, it seems more plausible that Kelly acted alone without telling anyone his plans to rob the liquor store. Thus, antagonistic defenses between Aikins and Nash did not exist, and Aikins was not prejudiced on this ground by a joint trial.

Next, Aikins contends that the evidence the State used to prove its case against Nash was unfairly prejudicial to him (Aikins). The State did introduce evidence that Nash stated there was "too much light" at the first liquor store and that Nash asked "who talked" after he was arrested. Further, the State did mention Nash's participation in a gang. However, such comments were not necessarily attributable to or prejudicial to Aikins.

In *State v. McQueen & Hardyway*, 224 Kan. 420, 582 P.2d 251 (1978), two defendants were charged and tried together for two burglaries, four robberies, one conspiracy, and one murder. Defendant 1 wrote a letter to Defendant 2 suggesting that the State's key witness be killed. The letter was introduced into evidence against Defendant 1. Further, Defendant 1 was also charged with a crime of which Defendant 2 was not charged. However, in presenting evidence regarding this crime, testimony was introduced to indicate Defendant 2, although uncharged, was involved with this crime. Finally, Defendant 1 made an exculpatory statement after his arrest which was admitted into evidence at the trial of Defendant 1 and Defendant 2. This court found that the trial court's failure to order separate trials did not result in unfair prejudice to Defendant 2. 224 Kan. at 426.

In *Holley*, 238 Kan. at 508-09, Defendant 2 claimed that he was prejudiced because he was tried together with Defendant 1. This court disagreed, stating:

"While it is true that there was a greater amount of evidence against [Defendant 1] than against [Defendant 2], a claim of disparate evidence justifies severance in only the most extreme cases. *United States v. Bolts*, 558 F.2d 316 (5th Cir. 1977). A defendant is not entitled to severance simply because separate trials would provide him with a better chance of acquittal. Before a trial court may grant severance on this ground it must be shown that the prejudice which would flow from a joint trial would be beyond the curative power of a cautionary instruction, thereby denying the defendant a fair trial. *United States v. Alpern*, 564 F.2d 755 (7th Cir. 1977). In this case, an adequate cautionary instruction was given. We can assume it was within the jury's capacity to follow this instruction and to assess each defendant's guilt or innocence solely on the basis of the evidence against him. [Citation omitted.] "

In Aikins' case, the trial court also provided a cautionary instruction to the jury. The instruction stated:

"You should give separate consideration to each defendant. Each is entitled to have his case decided on the evidence and the law which is applicable to him."

It is reasonable to assume that the jury followed the instruction and assessed Aikins' guilt or innocence based solely on the evidence presented against him and not on the evidence presented against Nash.

Finally, Aikins contends that Nash could have been compelled to testify on Aikins' behalf if Aikins had been given a separate trial. The State argues that if the case had been severed and Aikins' trial had been conducted first, Nash would have still retained his Fifth Amendment right to refuse to testify. Further, even if Nash's trial had proceeded first, Nash could have retained his right to refuse to testify at his own trial and at Aikins' trial in order to avoid self-incrimination. Thus, whether the trials were joint or separate, Aikins never would have had the ability to force Nash to testify on Aikins' behalf unless Nash first testified at his own trial.

Further, at the hearing on the motion to consolidate, the State pointed out that it was planning to call 30 witnesses, including a couple of experts with scheduling problems. There was also a witness who was being held in jail pursuant to a material witness bond. Codefendant Nash did not object to the consolidation of the cases. At argument on the motion to consolidate, Aikins' counsel stated the defenses were *not* antagonistic to one another. Aikins' concern with consolidation was whether gang evidence against Nash would prejudice Aikins. In response to this concern, the trial court granted a motion in limine pertaining to the alleged gang membership of the defendants. Thus, the trial court did not abuse its discretion in consolidating Aikins' and Nash's trial.

## VOIR DIRE

Aikins' codefendant at trial, Nash, also raises this issue in his separate appeal. The arguments raised by both Aikins and Nash are discussed in this case.

Aikins is white. Nash is black. The population of Johnson County is 95.5% Caucasian. This case received a large amount of media attention in Johnson County.

To deal with the race and publicity issues, Nash's defense counsel filed a pretrial motion for individually sequestered voir dire or venire questionnaires. Nash was concerned that a potential juror might make a racist statement or refer to information about the crime, gleaned through the extensive publicity of the crime, that would contaminate and prejudice the entire jury pool. As such, Nash asked that the potential jurors be questioned individually as

to the race and publicity issues, or at least be given a written questionnaire so they could write down any prejudices that might harbor in private. Further, Nash argued that the potential jurors might not be willing to admit they were prejudiced against the defendants, based on race or on publicity, in front of a whole group of potential jurors. However, Nash claimed the potential jurors might be willing to admit such prejudices if they were questioned individually on these issues or if they were asked to address these issues in a private questionnaire.

The prosecutor argued that he had never seen one potential juror contaminate an entire jury pool with his or her comments. The State acknowledged that some potential jurors might be afraid to speak up and explain their prejudices, based on race or publicity, in front of the whole jury pool. However, the State argued this problem could be cured by allowing the potential jurors to approach the bench on some of these more sensitive issues so the matter could be handled individually at the bench with just the lawyers and the judge.

Aikins joined in Nash's motion. Aikins argued that a questionnaire would allow the potential jurors to be more honest about their prejudices than would an open voir dire, an individually sequestered voir dire, or a bench voir dire, where the potential jurors would still have to voice their prejudicial opinions in front of lawyers and a judge. The trial court denied the motion for individually sequestered voir dire or venire questionnaires.

At voir dire, the potential jurors were questioned in panels, with the remaining jury pool watching the proceedings. The court warned the potential jurors not to blurt out any information that they might have about the case. Further, Nash's defense counsel encouraged the potential jurors to approach the judge individually at the bench if they had racial prejudices which they did not want to express out loud.

Aikins and Nash appeal the trial court's denial of their motion for individually sequestered voir dire or venire questionnaires.

"The purpose of the voir dire examination is to enable the parties to select competent jurors without bias, prejudice, or partiality. The nature and scope of the voir dire examination is within the sound discretion of the trial court. *State v.*

*Zamora*, 247 Kan. 684, 803 P.2d 568 (1990). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991). In determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate tribunals have the duty to make an independent evaluation of the circumstances. *Sheppard v. Maxwell*, 384 U.S. 333, 362, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966)." *State v. Lumbrera*, 252 Kan. 54, 59, 845 P.2d 609 (1992).

See also *State v. Shannon*, 258 Kan. 425, 433, 905 P.2d 649 (1995) ("[T]he manner in which voir dire is conducted must lie within the sound discretion of the trial court.").

In *Shannon*, 258 Kan. at 432-34, the defendant filed a motion to voir dire the venire individually. The case involved the shooting of a doctor who ran an abortion clinic, and the defendant requested individual voir dire so that if one juror voiced an extreme belief on the abortion issue, this statement would not contaminate the entire jury panel. According to the defendant, individual voir dire was needed to insure a fair trial.

The trial court denied the defendant's motion for individual voir dire. The trial court found no need to question jurors separately, but if specific questions arose which might cause problems, the court found that these questions could be asked individually.

On appeal, the defendant asserted that she was not able to question potential jurors about whether they had heard in the media that the defendant had been involved in other illegal anti-abortion activities because such questioning would have alerted the entire jury panel to this prejudicial information. According to the defendant, she would have had more of an opportunity to discover how the potential jurors were honestly affected by the pretrial publicity if she had been allowed to conduct individual voir dire.

This court affirmed the trial court, finding that the denial of the motion for individual voir dire was proper. In upholding the trial court, this court pointed out that the trial court left open the possibility of allowing individual voir dire if an actual need was demonstrated during jury selection. Further, this court found that the

mere possibility of taint did not prevent the defendant's counsel from questioning the venire about pretrial publicity. Finally, this court held that there was no showing the potential jurors would have been more honest if they had been questioned separately. As such, this court ruled that the trial court did not abuse its discretion in denying the defendant's motion for individual voir dire.

In this case, the defendants were allowed to fully question the jury pool regarding pretrial publicity and racial attitudes without fear of contamination. As per the trial court's instructions, if a potential juror had a prejudicial answer and did not feel comfortable expressing this answer out loud, the potential juror could tell the judge the answer privately at the judge's bench without having to express it in front of the entire jury pool.

Nash contends that it is impossible for him to affirmatively show that he was prejudiced by the potential jurors' bias because these prejudices went unspoken in the group voir dire—which is precisely why Nash wanted the potential jurors to be individually questioned in person or in a questionnaire regarding their biases. Nash contends that the means employed to test juror impartiality did not create " 'a reasonable assurance that prejudice would be discovered if present,' " especially when the trial judge himself acknowledged that the white veniremen might conform to the pressures of political correctness and not admit their prejudices in open voir dire. *United States v. Greer*, 968 F.2d 433, 435 (5th Cir. 1992) (quoting *United States v. Saimiento-Rozo*, 676 F.2d 146, 148 [5th Cir. 1982]), *cert. denied* 507 U.S. 962 (1993).

We have reviewed the transcript of the voir dire proceedings. The jurors were questioned extensively on pretrial publicity and whether they were prejudiced by this publicity. Several potential jurors admitted, without hesitation in front of the entire venire, that they had been prejudiced by pretrial publicity. These persons were excused for cause. As to the issue of race, Nash's defense counsel did not specifically question each potential juror to determine if he or she was prejudiced against black persons. Instead, the counsel told the venire that if they suspected they were prejudiced against Nash because he was black, they should let the judge know at the next recess. Previously during the voir dire, one of the

veniremen had approached the bench to discuss with the judge in private the venireman's bad experience with a prosecutor because he had been repeatedly charged with the same DUI. This venireman was discharged for cause. From this venireman's experience, the rest of the jurors were able to see how easy it was to tell the judge, on an individual basis, that they could not be impartial due to their prejudices. The potential jurors were not forced to voice their prejudices in front of the entire jury pool.

The trial court's denial of the defendants' motions for individually sequestered voir dire or venire questionnaires was not arbitrary, fanciful, or unreasonable. The trial court provided an avenue to deal with prejudices which the potential jurors did not want to voice in front of the entire pool, and the court did not think an additional avenue, such as venire questionnaires, was necessary or would provide any additional information. The trial court did not abuse its discretion in denying the defendants' motions.

## JURY ORIENTATION

At trial, Nash's defense attorney made an oral motion in limine to prevent either side from explaining what "reasonable doubt" is in voir dire. After discussing the motion with the parties, the court made the following disclosure:

"I must tell you and I should disclose this since the issue has been brought up. In my orientation that I usually do and that I did today but nobody was present, but they [the potential jurors] were all listening, I explained there were three— that there were three levels of proof in legal cases and that I used an example of an intersection accident as a typical civil case and said the burden of proof on the plaintiff in that case was a preponderance of the evidence and that means more probably true than not true. I told them [that in] a parental rights termination case, the burden was higher. It was clear and convincing evidence. That in a criminal case it was the highest standard of all, beyond a reasonable doubt, but there was—that in most legal propositions *nothing could be proved to a one hundred percent scientific certainty*. Now, I'm going to tell you that's essentially what I told them. If you want to make a motion for anything right now, you can do so."

Nash's attorney made a motion to discharge the jury panel based on the court's reference to the numerical percentage of 100%. The defense counsel alleged that beyond a reasonable doubt means more than 50%. However, he contended, with the court's com-

ments, the jury might think that it had to be above 80% to be beyond a reasonable doubt.

The court denied the motion, stating: "Well, I probably should have used the phrase absolute certainty rather than hundred percent certainty. I don't believe that this panel has been prejudiced by that number."

At this time, Aikins joined Nash's motion, and the court again denied the motion to discharge the jury panel. Aikins appeals this ruling.

At issue in this case is a jury orientation comment, not a jury instruction. These are not considered the same thing. See *State v. Cook*, 259 Kan. 370, 386, 913 P.2d 97 (1996); *State v. Gibbons*, 256 Kan. 951, 964-65, 889 P.2d 772 (1995). In *State v. Gadelkarim*, 256 Kan. 671, 887 P.2d 88 (1994), and *State v. Nguyen*, 251 Kan. 69, 833 P.2d 937 (1992), this court analyzed jury orientation comments and other similar statements under the judicial misconduct standard of review. *Gadelkarim* provides:

"Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. *State v. Nguyen*, 251 Kan. 69, Syl. ¶¶ 4, 5, 833 P.2d 937 (1992)." 256 Kan. at 677.

Under this standard of review, the trial court properly denied the defendant's motion to discharge the jury panel based on the jury orientation comment at issue.

In *State v. Miller*, 90 Kan. 230, 133 Pac. 878 (1913), the defendant moved to quash the venire based on jury orientation comments made by the trial court. This court found that the jury orientation comments did not require a new trial. In so holding, the court stated:

"Those who have had experience as trial judges know how much easier it is to criticize their conduct and rulings than to perform their arduous and perplexing duties free from error. The address in question contained many practical and commendable suggestions to the men about to enter upon duties new and in a

degree mysterious to them, and while we think the concededly able and admirable trial judge crowded the danger line in some of the quoted remarks, which should have been omitted, we are not convinced that all of those made, taken together, precluded those to whom they were directed from heeding and following proper instructions in a criminal case tried two weeks later." 90 Kan. at 239.

In *Nguyen*, 251 Kan. 69, the trial court made some comments to the jury after closing arguments, attempting to explain the process of jury questions and readbacks. In so doing, the trial court improperly mentioned that the defendant would have a right to appeal the case. This court denied the defendant's request for a new trial based on this comment, finding that the defendant only alleged the possibility of prejudice arising out of this comment, but did not prove that actual prejudice occurred. 251 Kan. at 78-80.

In *Gadelkarim*, the defendant challenged several comments the judge made during the orientation of potential jurors. The trial judge referred to the defendant's right to appeal, and this court disapproved of the comment. Nevertheless, this court held that the defendant had the burden to prove his substantial rights were prejudiced by the comment so as to deprive him of a fair trial. Since the defendant only showed the mere possibility of prejudice and did not prove actual prejudice, this court did not find reversible error in the jury orientation comment. 256 Kan. at 680-81.

Here, the questionable comment explaining reasonable doubt occurred during orientation of potential jurors. However, after all the evidence in the case was presented, the judge read the jury the jury instruction on reasonable doubt, PIK Crim. 3d 52.02. The trial lasted almost 2 weeks. We find that the jury would have relied on the actual jury instruction regarding reasonable doubt, which was provided right before it went into deliberations, and not on a jury orientation comment regarding reasonable doubt which was made 2 weeks earlier when the jurors were not even sure they would be selected as jurors. Thus, under the facts and circumstances surrounding the jury orientation comment, we hold that the comment did not reasonably mislead the jury or actually prejudice the substantial rights of the defendant. We do not find reversible error on this issue.

## GANG MEMBERSHIP

Nash also raises this issue in his appeal. The arguments raised by both defendants are addressed in this case. Both Aikins and Nash filed a motion in limine, requesting that the court preclude evidence of gang membership or gang activity in the trial. Since there was no showing that the charged crimes were gang related, the trial court granted this motion in limine. In so ruling, the court stated:

"I'm in agreement with the defendants' position that I don't see how the gang membership has substantial probative value in this case. I think the fact that they know each other is sufficient. I don't think that this would make any difference whether they knew each other because they were school chums, rugby teammates or gang members. I feel like the probative effect of gang membership is outweighed by the prejudicial effect.

"That being said, I'm going to move on to if there comes a time during the course of trial that the State feels that it could not make sense of the testimony of a particular witness without reference to that, we'll talk about it at that time, but for now we'll reference the Motion in Limine pertaining to gang membership of the defendants will be sustained. There will be no mention of gang memberships."

During the trial, the State examined Damon McGlory on direct regarding the group's trip back to Olathe from Parsons with Terrance Kelly and whether the group was aware that Kelly had brought a gun with him.

"Q. On the way back [to Olathe] when T-Money rode back with you guys, did he bring anything unusual with him?
"A. Yeah.
"Q. What did he bring?
"A. He brought a twelve gauge shotgun.
. . . .
"Q. Did anybody ask or did he mention why he was bringing the shotgun?
"A. Just for rivals—for rivals group.
"Q. For a rival group?
"A. Yeah.
"Q. Terrance said that?
"A. Yeah.
"Q. Is that the words he used?
"A. No, he said Bloods—for Blood.
"Q. Is that Bloods a gang?
"A. Yeah."

Immediately after McGlory made this statement, Aikins' defense counsel objected and moved for a mistrial. Aikins' counsel asserted that the State had intentionally injected the word gang and Bloods into the trial, in direct contravention of the trial court's order in limine precluding the admission of gang evidence into trial. The defense counsel argued that the State should have left McGlory's reference to "rival groups" unexplored. Instead, the State continued to question McGlory on why Kelly bought the gun until McGlory made clear that Kelly bought the gun to protect the group from a rival gang called the Bloods. According to the defense counsel, the fact that the group needed protection from a rival gang clearly implied that the group, including Aikins and Nash, were in a gang.

In response, the prosecutor asserted that he attempted to abide by the court's order in limine because he had specifically instructed McGlory, as late as 12:45 p.m. that day, not to mention any gang involvement concerning himself, Aikins, or Nash. The prosecutor also told McGlory that he could testify as to what Terrance Kelly said as long as it did not relate to Aikins or Nash. The prosecutor argued that it was necessary to explore McGlory's answer and to clarify exactly why Kelly brought the gun with him because he thought the defense would try to portray Kelly as a wild man who brought a gun to Olathe and shot a man without telling anyone he was going to do so. The prosecutor stated that he thought he was in complete conformance with the court's order in limine, and the prosecutor stated that he would stay away from gang references in the future.

The trial court found that McGlory's testimony clearly indicated that Terrance Kelly was in a gang. However, the trial court denied the motion for a mistrial and cautioned the State not to ask any questions which could possibly elicit gang comments.

After the jury found Aikins and Nash guilty of aggravated robbery and felony murder, Aikins moved for a new trial. Aikins' defense counsel argued that one reason the trial court should grant a new trial was that the trial court improperly refused to grant a mistrial based on the above gang testimony, which was in violation

of the court's order in limine. The trial court denied Aikins' motion for new trial.

Aikins and Nash appeal the trial court's refusal to grant a mistrial based on the State's failure to comply with the trial court's order in limine precluding gang evidence. On appeal, the defendants point to several other instances during the trial in which they allege the State violated the trial court's order in limine.

For instance, during the State's cross-examination of Aikins, the following exchange transpired:

"Q. Your nickname—your moniker is A.K., is that correct?

"A. No, that's Robbie.

"Q. Okay, Well, we've been hearing about you being A.K. Is that one of your nicknames?

"A. That's what some people call me.

"Q. Like your buddies call you that?

"A. Lot of people call me that.

"Q. Like A.K. as in AK-47?

"A. No, A.K. as in A-I-K-I-N-S.

"Q. You know what an AK-47 is, don't you?

"A. I have an idea.

"Q. It's a high powered semi-automatic weapon, correct?"

At this time, Aikins' counsel objected to this line of questioning as irrelevant because an AK-47 was not used in this case and because there was no evidence that A.K. was anything but a nickname for Aikins. In response, the State noted "in the gang script there is evidence of AK-47." Aikins' defense counsel objected again, stating that this was an improper area of cross-examination. The prosecution pointed out that the defendant had already answered the question and that he was done with that line of questioning. The trial court did not rule on the defendant's objection.

Next, the defendants assert that the State violated the order in limine again by referring to gangs a third time while continuing to cross-examine Aikins. This alleged reference occurred during the State's examination of Aikins about the hat Kelly was wearing when he robbed the liquor store and shot Martin.

"Q. And he's wearing this cap, is that right?

"A. Yeah.

"Q Now, is that your cap?

"A. Yes, somebody got that for me.
"Q. 'Thug Life'? [words printed on the cap]
"A. Yeah.
"Q. Do you know what 'Thug' means?
"A. I know that's a rapper—that's a rapper that says that.
"Q. Well, thug is another word for robber, isn't it?
"A. I wouldn't know.
"Q. Have you ever heard of the thug gang at all out of India years ago, an ancient group who robbed and—
"A. I don't know what you are talking about."

At this time, the defense counsel objected and moved for a mistrial because he claimed the prosecutor was trying to inject the word gang into the trial at every opportunity, which was clearly in violation of the order in limine. The prosecutor explained that there was "an ancient gang from India called the thugs and they mugged people and beat them up." According to the prosecutor, he was not in violation of the trial court's order in limine. The trial court denied the defendant's motion for mistrial.

Later in his continued cross-examination of Aikins, the prosecutor asked:

"Q. In fact, you are into that whole lifestyle, aren't you?
"A. I don't know what you mean.
. . . .
"Q. . . . . You are saggin' and baggin'?
. . . .
"Q. That's real popular with some groups, right?
"A. That's popular with a lot of people.
"Q. Popular with your group, isn't it?
"A. Popular with a lot of people.
"Q. I won't quarrel with you there."

After having objected twice to this line of questioning and having been overruled twice, Aikins' defense counsel asked to approach the bench. The defense counsel argued that what types of clothes Aikins wore was irrelevant because men in three-piece suits also commit crimes. The court sustained Aikins' objection and asked the prosecutor to "get off" the "dress thing." The prosecutor discontinued questioning Aikins about his clothes or his "saggin' and baggin' " lifestyle.

However, just a few moments later, the prosecutor questioned Aikins about his relationship with his corrections officer.

"Q. And sometimes [the corrections officer would] gripe at you because you would come in with your hair in corn rows?

"A. She said she didn't like it.

"Q. She didn't like that and she got mad at you because sometimes you would come in with your eyebrows shaved with a razor blade where you carve things in your eyebrows, right?

"A. I haven't carved anything. I might have put lines in it.

"Q. I'm sorry. I mean carving the hair, right?

"A. I might have put some lines in it. I don't know. I might have cut the hair."

At this time, Aikins' defense counsel objected, alleging that the prosecutor was trying to back-door gang evidence and circumvent the order in limine. The prosecutor said he was done with that line of questioning, and the objection was not ruled on. The prosecutor resumed cross-examining Aikins on a different subject.

K.S.A. 22-3423 provides:

"(1) The trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because . . .

. . . .

(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

"Terminating a trial and declaring a mistrial on one of the statutory grounds listed in K.S.A. 22-3423 is largely within the discretion of the trial court. A clear showing of abuse of discretion must be made before the decision of the trial court will be set aside on appeal." *State v. McQueen & Hardyway*, 224 Kan. 420, Syl. ¶ 4, 582 P.2d 251 (1978). Further, the abuse of discretion standard is applied in reviewing an order denying a new trial and in reviewing a motion in limine. *State v. Rowell*, 256 Kan. 200, Syl. ¶ 2, 883 P.2d 1184 (1994); *Taylor v. State*, 251 Kan. 272, 276-77, 834 P.2d 1325 (1992).

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Judicial discretion must

thus be considered as exercisable only within the bounds of reason and justice in the broader sense and be considered abused only when it plainly over-passes those bounds." *State v. Lumbrera*, 257 Kan. 144, 148, 891 P.2d 1096 (1995).

See *State v. Rinck*, 256 Kan. 848, 853, 888 P.2d 845 (1995) (declaration of mistrial).

The only way the trial court could have abused its discretion in refusing to grant a mistrial is if the State actually violated the trial court's order in limine precluding gang evidence at trial. Even if this is so and a violation of the order did occur, this does not necessarily mean that the trial court abused its discretion in refusing to grant a mistrial.

"A two-part test evaluates alleged violations of a motion in limine. First, there must be a determination whether there was a violation of the order in limine. Second, if the order in limine is violated, there must be a determination whether the testimony elicited in violation of the order substantially prejudiced the defendant. The burden is on the defendant to show he or she was substantially prejudiced." *State v. Warden*, 257 Kan. 94, Syl. ¶ 9, 891 P.2d 1074 (1995).

First, it is necessary to evaluate whether the above portions of trial testimony actually violated the trial court's order in limine precluding references to gangs. As to the "rival group"/"Bloods" gang reference, the defendants assert that the State had four separate opportunities to stop questioning McGlory about why Kelly brought the gun and about the "rival groups." Instead, according to the defendants, the prosecutor continued to question McGlory until he elicited a gang reference which was prejudicial to the defendants and was in contravention of the order in limine.

The State claims that McGlory's comment did not refer to gang membership by Aikins or Nash; only Kelly. The defendants claim that the exchange indicated that all four youths were to receive protection from the Bloods gang by use of the gun. According to the defendants, the testimony indicated that since the only people who worry about protection from a rival gang are gang members themselves, all four youths were gang members.

This testimony could be construed in a nonprejudicial manner to indicate that the youths needed protection from gangs, but that they themselves were not in a gang, or that Kelly was the only one of four who was in a gang. Nonetheless, the *continued* line of ques-

tioning was not consistent with the spirit of the order in limine. A reasonable juror could have understood the testimony to indicate that all four youths, including Aikins and Nash, were part of a gang. Thus, this testimony violated the trial court's order in limine precluding gang references.

The next question is whether the defendants have proven that the testimony elicited in violation of the order in limine substantially prejudiced them. The State argues that the defendants have not demonstrated that this two-line reference to gangs out of a 1,200-page transcript of a 2-week trial was so prejudicial that the jury would not have found the defendants guilty without this evidence. See *Brecht v. Abrahamson*, 507 U.S. 619, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993), *reh. denied* 508 U.S. 968 (1993) (improper references to a defendant's post-*Miranda* silence were found to be harmless error because, *inter alia*, the references comprised less than 2 pages of a 900-page transcript and a few minutes in a 4-day trial).

We agree with the State. The jury was presented with much evidence of the defendants' guilt. The State's minimal violation of the motion in limine was not prejudicial. As such, the State's violation of the motion in limine did not justify a mistrial. The trial court did not abuse its discretion in denying the motion for mistrial based on this violation.

Next, the defendants challenge the AK-47 reference. However, the defendants' objection at the time of the trial was not that the reference violated the order in limine, but that the line of questioning was irrelevant. The defendants made no motion for a mistrial at this point. This specific issue is raised for the first time on appeal. "A defendant cannot raise points on appeal which were not presented to the trial court." *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993). Thus, this issue is not addressed.

Next, it must be determined whether the "thug gang" line of questioning violated the order in limine. The prosecutor was trying to focus on Kelly's hat which said "Thug Life" and the fact the word thug means robber in order to show that the defendants had *knowledge* of the planned robbery, thereby rebutting the defendants' no-knowledge, no-intent defense. It does not appear to us

that the prosecutor was trying to imply at this point in the testimony that the defendants were members of a modern-day gang. A reasonable juror would not have interpreted the exchange in this way. The questioning did not violate the trial court's order in limine. Thus, the trial court did not abuse its discretion in refusing to grant a mistrial based on this exchange.

Next, the defendants challenge the "saggin' and baggin' " reference. Again, the defendants' objection at the time of the trial was not that the reference violated the order in limine, but that the line of questioning was irrelevant. The defendants did not ask for a mistrial at this point. This specific issue is raised for the first time on appeal. "A defendant cannot raise points on appeal which were not presented to the trial court." *Johnson*, 253 Kan. at 91.

Finally, it must be determined whether the "carved eyebrow" line of questioning violated the order in limine. A reasonable juror would not have interpreted the eyebrow exchange as implying that Aikins was in a gang. As a part of his defense, Aikins argued that he did not know Kelly had a gun with him and that if he had known, he would not have hung around with Kelly because being in possession of the gun would have violated his probation. Through the eyebrow line of questioning, the State was trying to show that Aikins did not care if he violated his probation in other ways or made his corrections officer angry through the way he wore his hair or eyebrows. As such, the State wanted to imply that Aikins would not care if he broke his probation by knowingly being around Kelly's gun. This is what the State was trying to convey through the eyebrow line of questioning, not that Aikins was in a gang where members shaved their eyebrows. A reasonable juror would have interpreted the line of questioning as it was intended. The eyebrow line of questioning did not violate the order in limine. Thus, the trial court did not abuse its discretion in refusing to grant a mistrial based on this exchange.

The trial court is in the best position to determine if its order in limine has been violated and to determine the degree of prejudice a violation may have caused the accused. If the prejudice is substantial, the trial judge should not hesitate to declare a mistrial. Here, the trial judge did not err in refusing to declare a mistrial.

## EXCULPATORY INFORMATION

Some additional facts are necessary to address this issue.

The State called Detective Siebers on direct examination. Siebers was one of the police officers who interviewed Damon McGlory. Siebers testified that McGlory was one of the people in Aikins' car when the aggravated robbery and murder occurred. According to Siebers, a few days after the murder the police located McGlory. The officers read McGlory his *Miranda* rights, and McGlory voluntarily went with the officers to the Olathe Police Department. Siebers testified that in the police car on the way to the station, McGlory commented that Aikins and Nash were in on planning the liquor store robbery. Siebers wanted to take a tape-recorded statement from McGlory, based on what McGlory had said in the car. Siebers testified that once in the interview room, he gave McGlory a written copy of his *Miranda* rights and asked him to sign it. At this time, McGlory said he wanted to talk to an attorney, and the interview was terminated.

However, according to Siebers' testimony, the officers thought that McGlory had additional information about the others who were involved in the crime. Siebers stated that when McGlory's mother came to the Olathe Police Department, the officers told her that they wanted to talk to McGlory about the others involved in the crime, even though he had invoked his right to counsel. At trial, Siebers testified that the officers told McGlory's mother that anything McGlory said in the interview, after having invoked his right to counsel, could not be used against him.

Upon hearing this testimony at trial, Aikins' defense counsel moved for a mistrial. The defense counsel argued that this promise of immunity to McGlory, a key witness against Aikins, was exculpatory information which should have been provided to Aikins before trial. Instead, the defense argued that it did not find out about this exculpatory information until the trial and that it was totally surprised to learn that McGlory was granted immunity from his second statement. According to the defense counsel, if this information had not been a surprise, he could have used it in his cross-examination of McGlory to determine whether McGlory thought

he had immunity when he was making the second statement due to this promise.

In response, the State argued that McGlory was not in fact granted immunity from the second statement, regardless of what his mother was told. McGlory was to be prosecuted for his participation in the crimes in a juvenile proceeding. Further, the State argued that this promise to McGlory's mother was not withheld from the Aikins because it was in the police reports, which Aikins had access to.

The court denied the motion for a mistrial. At this time, the State continued its direct examination of Detective Siebers, and the following exchange occurred:

"Q. Did you talk to his mother?

"A. Yes, sir.

"Q. And did she talk to him?

"A. Yes.

"Q. Did he agree to be interviewed again—Mr. McGlory?

"A. Yes, after his mother went in and talked to him she came back out and invited us into the room—back into the interview room where they had been and I asked him if he wanted to answer any questions and he indicated that he would.

"Q. Okay. Now, was there any kind of—at that stage of the game, at that stage of the proceedings, *was there any kind of a deal with Damon?*

"A. *No, the only deal with him was that he would go home that night.*

"Q. Was there any kind of a deal with him as to what he would be charged with or not be charged with or whether the State would make an attempt to treat him like an adult or anything like that?

"A. No, sir.

"Q. Did you explain that to him?

"A. Yes, sir, I told him clearly that he had some exposure to prosecution on a number of charges and that once the case was reviewed by the District Attorney's office he well could wind up being charged with a number of crimes.

"Q. And he was, correct?

"A. Yes, sir.

"Q. Did he still agree to talk to you?

"A. Yes." (Emphasis added.)

Aikins appeals the trial court's refusal to grant a mistrial. According to Aikins, a mistrial should have been granted based on the obvious exculpatory nature of the information, and the surprise and prejudice that resulted from the State's nondisclosure of its agreement with McGlory.

In reviewing a trial court's refusal to grant a mistrial, this court is to use an abuse of discretion standard. *State v. Bradford*, 254 Kan. 133, Syl. ¶ 4, 864 P.2d 680 (1993). "A judge's power to declare a mistrial is to be used with great caution, under proper circumstances, to insure that all parties receive a fair trial." *State v. Chandler*, 252 Kan. 797, Syl. ¶ 2, 850 P.2d 803 (1993).

The general rules regarding exculpatory evidence are as follows:

"A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant." *State v. Carmichael*, 240 Kan. 149, 152, 727 P.2d 918 (1986).

This "duty to disclose exculpatory evidence to the defense exists even where no request has been made." *State v. Kelly*, 216 Kan. 31, 34, 531 P.2d 60 (1975).

"There are three classifications regarding suppression of evidence [failure to disclose exculpatory evidence]: (1) where there is a deliberate bad faith suppression for the purpose of obstructing the defense or intentional failure to disclose evidence which has high probative value and which could not have escaped the prosecutor's attention; (2) where there is a deliberate refusal to honor a request for evidence where evidence is material to guilt or punishment, irrespective of the prosecutor's good or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that the defense could have put the evidence to significant use." *Carmichael*, 240 Kan. at 152 (citing *Kelly*, 216 Kan. at 34).

In analyzing which classification of evidence suppression allegedly occurred in this case, Aikins points out that he had a discovery order which directed the State to inform him of any agreement reached with McGlory. According to Aikins, the State did not honor this order because the State failed to inform Aikins of its promise to McGlory that any incriminating comments McGlory made in his second statement would not be used against him. Thus, Aikins asserts that this evidence suppression meets the second classification of *Carmichael* because the State deliberately refused to honor a request for evidence which was material to guilt or punishment, irrespective of whether the State refused the request in good faith or bad faith.

Each evidence suppression classification is judged with an increasingly stringent standard on a defendant. For instance, under the third classification, the court "require[s] a substantially higher probability that disclosure of the evidence to the defense would have altered the result"; while, under the second classification, the standard is not as stringent because "the prosecution knows of the defense's interest, and, if it has failed to honor this even in good faith, it has only itself to blame." *Kelly*, 216 Kan. at 34-35.

Regardless of the stringency of the standard used, to grant a mistrial based on evidence withheld by the prosecution, the evidence must be clearly exculpatory, and the evidence must be material so that its suppression was clearly prejudicial to the defendant. *State v. Humphrey*, 258 Kan. 351, 355, 905 P.2d 664 (1995) (citing *Carmichael*, 240 Kan. 149, Syl. ¶ 1).

Using the strict standard of review for the second classification, the first question is whether the evidence withheld was clearly exculpatory. "Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment." *Carmichael*, 240 Kan. at 153; accord *Kelly*, 216 Kan. at 36 (citing *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 [1963]). Evidence is also exculpatory if it bears "upon the credibility of a key witness on an important issue in the case." *Kelly*, 216 Kan. at 36. Because the reliability of a key witness' testimony has a significant impact on a jury's decision of guilt or innocence, evidence materially affecting credibility qualifies as exculpatory evidence. *Kelly*, 216 Kan. at 36-37 (citing *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 [1972] [holding that credibility of a witness is a material issue when the prosecution's case rests almost entirely upon the testimony of that witness]). Impeachment evidence is considered "evidence favorable to the accused for the purpose of the disclosure requirement." *Humphrey*, 258 Kan. at 355.

McGlory was a key witness in the case. He gave very important testimony, including the fact that Aikins knew about the planned robbery because it was discussed in the car on the drive from Parsons to Olathe and because it was discussed throughout the day of the robbery. The reliability of this key witness was very important

and had a significant impact on the jury's finding of guilt. Evidence that the State promised not to use McGlory's second statement against him would have affected McGlory's credibility had he been questioned about this on cross-examination. Since this evidence could have been used to impeach the credibility of McGlory on an important issue in the case, the evidence is favorable to the accused and therefore qualifies as exculpatory evidence.

The next question is whether the evidence is *so material* that the State's withholding of evidence *clearly prejudiced* Aikins. *Carmichael*, 240 Kan. at 153, discussed material evidence:

"There are at least three different standards for determining materiality: (1) evidence which may be merely helpful to the defense; (2) evidence which raises a reasonable doubt as to defendant's guilt; and (3) evidence which is of such a character as to create a substantial likelihood of reversal. Comment, *Materiality and Defense Requests: Aids in Defining the Prosecutor's Duty of Disclosure*, 59 Iowa L. Rev. 433, 445 (1973).

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that *if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the record. [Citation omitted.] " (Emphasis added.)

Evidence is material if it might have created reasonable doubt and affected the outcome of the trial. *State v. Smith,* 245 Kan. 381, 384, 781 P.2d 666 (1989). " '[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. [Citation omitted.] ' " *Humphrey,* 258 Kan. at 355; accord *Smith,* 245 Kan. at 385.

The exculpatory evidence which was withheld from the defendants in this case was material. Admitting this evidence into trial would have impeached the credibility of the State's star witness. Such impeachment might have created a reasonable doubt as to Aikins' guilt that did not otherwise exist or at least created a reasonable probability that the result of the proceedings would have been different had the evidence been disclosed. If the evidence in question had been disclosed to Aikins in a timely manner, and if

McGlory had been impeached with the evidence, then the jury might not have believed McGlory's testimony and might not have found Aikins guilty. Thus, the evidence is material. However, we do not find the evidence is so material as to clearly prejudice Aikins.

"To be clearly prejudicial, the evidence must prejudice the defendant's ability to defend against the charges. *State v. Burnison*, 247 Kan. 19, 27, 795 P.2d 32 (1990). Applying these principles to particular circumstances, the court has decided that if the evidence becomes available to defendant during trial and he is not prejudiced in defending against it, the prosecution's failing to disclose the evidence earlier will not constitute a due process violation. *State v. Wacker*, 253 Kan. 664, 673-74, 861 P.2d 1272 (1993). It follows that the State's failure to disclose exculpatory evidence before trial is not reversible error where the evidence becomes available to the defendant during trial and does not prejudice the defendant's ability to defend against the charges." *Humphrey*, 258 Kan. at 355-56.

In *Humphrey*, the State did not disclose certain exculpatory evidence to the defendant before the trial began. The evidence became known to defense counsel during trial. The evidence would have impeached the credibility of one of the State's witnesses, Tina Gray. Gray had already testified before the defendant learned of this exculpatory evidence. Gray was not recalled as a witness and was not impeached with the evidence. The defendant was convicted. On appeal, the defendant argued that it was impossible for him to confront Gray with this impeachment evidence because Gray had already been released from the State's subpoena before the defendant learned of the exculpatory evidence. The State disputed that Gray was unavailable and pointed out that the defendant made no effort to recall Gray as a witness. The State also pointed out that there was plenty of other evidence to support the jury's guilty verdict even if Gray's testimony could have been impeached. This court did not find prejudicial error even though the State did not disclose the exculpatory evidence to the defendant until the trial. 258 Kan. at 354-57.

In *Kelly*, 216 Kan. at 37, the State's key witness testified at trial to a story which he told the police many times before. However, this witness had previously told two police officers a different story. The State did not disclose this exculpatory evidence to the defendant before the trial. At trial, the two police officers testified for

the State and told the jury about the prior inconsistent statements of the State's key witness, thereby informing the defendant of this exculpatory evidence at trial. A separate witness also impeached the testimony of the State's key witness. Thus, this court found that the defendant was only deprived of the opportunity to recall the State's key witness to the stand and confront him with the prior inconsistent statements he made to the officers. This court found that the extent of this deprivation was not sufficient to require a new trial and found that the rights of the defendant were not clearly prejudiced.

In *Smith*, 245 Kan. at 386-87, this court found that the State had failed to timely disclose clearly exculpatory and material information to the defendant. However, the defendant learned of the evidence shortly before trial and in time to cross-examine the witness it involved. Upon learning of the evidence, the "[d]efense counsel did not request any additional time to develop this line of inquiry or to locate any possible corroborating witnesses." 245 Kan. at 386. Thus, this court found that the undisclosed exculpatory evidence did not have a reasonable possibility of affecting the trial's outcome and was not clearly prejudicial.

In *State v. Peckham*, 255 Kan. 310, 341, 875 P.2d 257 (1994), the State failed to disclose material, exculpatory evidence until trial. The defendant argued that he was clearly prejudiced in defending the case, due to this untimely disclosure, because he did not have time to investigate or utilize the evidence adequately. On appeal, this court rejected the defendant's argument, stating:

"[The defendant] does not suggest what further evidence would have been revealed had he received timely disclosure of this evidence and been able to adequately investigate further. He does not suggest that this trial strategy would have differed had the evidence been disclosed before trial. [The defendant's] ability to examine each of the witnesses testifying was not prejudiced by the delayed disclosure during trial of this evidence. He received continuances or recesses where appropriate, and he was able to fully examine each witness. In fact, the delayed disclosure most likely worked to [the defendant's] advantage because the credibility of the witnesses testifying against him was severely impaired when they were recalled to the stand and additional information was elicited from them. We affirm the trial court and find that no prejudicial error occurred." 255 Kan. at 341.

Here, because the evidence became available to Aikins during trial, the untimely disclosure is not a due process violation unless Aikins was prejudiced in defending against the evidence. Upon learning of the evidence, Aikins did not request a continuance or a recess to develop the impeachment testimony. Aikins does not argue on appeal that his trial strategy would have been different if the evidence had been disclosed before trial. McGlory's testimony was in fact impeached by the State's direct examination of Detective Siebers and by the defense counsel's cross-examination of Detective Siebers regarding the promise to McGlory not to use McGlory's second statement against him.

The defendant was only deprived of the opportunity to recall McGlory to the stand and confront McGlory directly with the fact that the second statement McGlory made implicating Aikins could not be used against McGlory. This deprivation is not clearly prejudicial because it appears that Aikins made no effort to recall McGlory and impeach his testimony. The State's failure to disclose this material, exculpatory evidence to the defendant until at the trial was not clearly prejudicial. As such, due process was not violated, and the trial court did not err in refusing to grant a mistrial.

## STATE'S CLOSING ARGUMENT

In its closing argument, the State tried to distinguish between Damon McGlory's and Jessica Smith's involvement in the crimes as compared to the involvement of Aikins and Nash. According to the State, Aikins and Nash had knowledge of the robbery, planned the robbery, and helped Terrance Kelly commit the robbery. In making this comparison, the State made the following comment:

"Compare and contrast Damon and Jessica cooperating with authorities. Heaven forbid they cooperate with authorities implicating themselves. Do you ever hear either one of them saying, hey, I didn't have anything to do with this? They all said we knew. We knew, because everybody knew.

"Compare and contrast that with the fact that Nash and Aikins, they lie to the police. *They never admit involvement in the crime. They just give as much as they have to give and only when confronted.*"

At this time, Aikins' defense counsel objected and requested a mistrial. The defense counsel alleged that the State's argument

improperly focused on Aikins' invocation of his right to remain silent in refusing to give a statement or admit guilt. According to defense counsel, this comment was in contravention of the Fifth Amendment. The trial court overruled the objection and refused to grant a mistrial.

Aikins appeals the trial court's refusal to sustain the objection and grant a mistrial.

"The declaration of a mistrial is a matter entrusted to the trial court's discretion. The test of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court." *State v. Bradford*, 254 Kan. 133, Syl. ¶ 4, 864 P.2d 680 (1993).

"In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Improper remarks made by the prosecutor in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial." *State v. Duke*, 256 Kan. 703, Syl. ¶ 5, 887 P.2d 110 (1994).

The determinative case in this area is *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). In *Doyle*, two defendants were arrested and given their *Miranda* warnings. The defendants remained silent at this time. However, at trial, the defendants made a viable argument that they had been framed. In order to impeach the defendants' testimony, the State cross-examined the defendants regarding their failure to tell the frame-up story when they were first arrested. The Supreme Court held that the use of the defendants' post-arrest, post-*Miranda* silence in this manner violated due process. In so holding, the court stated:

"Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker*, 417 U.S. 433, 443-444[, 41 L. Ed. 2d 182, 94 S. Ct. 2357] (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale*, [422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133 (1975)]. Moreover, while it is true that the *Miranda* warnings contain no

express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale*, [422 U.S.] at 182-183, put it very well:

> '[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with the due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this could not be the case.' " 426 U.S. at 617-19.

"A *Doyle* violation occurs when a defendant's post-arrest silence is used to impeach the defendant when an exculpatory explanation is subsequently offered at trial." *State v. Searles*, 246 Kan. 567, 572-73, 793 P.2d 724 (1990).

This court adopted the *Doyle* rule in *State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976). This rule was later expanded to prevent the State from commenting on a defendant's post-*Miranda* silence in closing argument. See *State v. Higgins*, 243 Kan. 48, 50-51, 755 P.2d 12 (1988), *abrogated on other grounds State v. Rinck*, 256 Kan. 848, 888 P.2d 845 (1995).

Kansas also has a statute which prevents the State from attacking a defendant's trial defense based on the defendant's silence after receiving his or her *Miranda* warnings. This statute, K.S.A. 60-425, provides:

> "Subject to K.S.A. 60-423 and 60-437, every natural person has a privilege, which he or she may claim, to refuse to disclose in an action or to a public official of this state or the United States or any other state or any governmental agency or division thereof any matter that will incriminate such person."

In making the statement at issue in closing argument, the State did not impeach Aikins by using his prior invocation of his right to silence and showing that this silence was inconsistent with the defense Aikins alleged at trial. In fact, Aikins never invoked his right

to silence. He made a post-*Miranda*, pretrial statement, and this statement was consistent with his testimony at trial. In both situations, Aikins admitted to driving the car, but claimed he was not aware beforehand that any crime was going to occur. The State made the challenged statement in closing argument to show that Aikins was not cooperative with the police. According to the State, if Aikins was an unknowing participant in the crime, which he alleged in his defense, then he would have been more cooperative with the police.

Aikins concedes that this factual situation does not meet the criteria of a *Doyle* situation. However, Aikins asks this court to extend the *Doyle* rule to this situation because, according to Aikins, the same policy concerns involved in *Doyle* are involved here. Thus, Aikins contends that the State's comment on his prior refusal to confess constitutes a violation of due process or at least prosecutorial misconduct requiring a mistrial.

Aikins' argument is faulty. The fact that the State pointed out that Aikins had not previously confessed seems to help the Aikins' case by indicating that he has consistently claimed his innocence. Thus, the trial court did not err in refusing to grant a mistrial based on the State's "refusal to confess" comment made in closing argument.

## JURY INSTRUCTIONS

Jury Instruction No. 12 provided:

"Each defendant is charged with the crime of felony murder in the first degree. The defendants plead not guilty.

"To establish this charge, each of the following claims must be proved with respect to each defendant:

1. That the defendant killed Gene Martin;

2. That such killing was done while in the commission of aggravated robbery;

3. That this act occurred on or about September 7, 1994, in Johnson County, Kansas.

"The elements of aggravated robbery are as follows:

1. That the defendant intentionally took property from the presence of Gene Martin;

2. That the taking was by force;

3. That the defendant inflicted bodily harm on Gene Martin in the course of such conduct; and

4. That this act occurred on or about the 7th day of September, 1994 in Johnson County, Kansas."

On appeal, Aikins challenges this instruction. However, Aikins did not object to jury Instruction No. 12 at trial.

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict." *State v. Whitaker*, 255 Kan. 118, 125, 872 P.2d 278 (1994).

The jury instruction at issue comports with PIK Crim. 3d 56.02. Aikins acknowledges this, but contends that PIK Crim. 3d 56.02 is clearly erroneous.

Aikins challenges the portion of the instruction which requires the jury to find "that the *defendant* killed Gene Martin" in order to convict the defendant of felony murder. Aikins contends that he did not kill Martin and that no evidence was introduced at trial to prove such proposition.

It is not clear why Aikins is even challenging this instruction. If the jury interpreted the instruction as Aikins argues it did, then the jury would have had to believe that Aikins himself killed Martin in order for Aikins to be guilty of felony murder. Since there was no evidence that Aikins himself killed Martin, the jury's interpretation of the instruction in this manner would have actually helped Aikins. While the reason for this challenge is unclear, we will address it.

"When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous." *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4, 874 P.2d 623 (1994).

When reading the instructions together, they properly, fairly, and clearly state the law.

Jury Instruction No. 11 provided:

"A person who, either before or during its commission, intentionally aids, abets, counsels, advises or assists another to commit a crime with intent to promote or

assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Based on this instruction, the jury found that Aikins aided and abetted the crime of aggravated robbery and was criminally responsible for such crime. Under Instruction No. 12, the jury found that Aikins committed aggravated robbery, as an aider and abetter, and that the killing of Martin occurred during the commission of the aggravated robbery. Thus, the jury found Aikins guilty of felony murder. Jury Instruction No. 12 was not in error.

## SUFFICIENCY OF THE EVIDENCE

Aikins argues that the evidence was insufficient to convict him of aggravated robbery and felony murder.

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994).

Aikins contends that the evidence was insufficient to find him guilty of aggravated robbery and felony murder because the State's key witness, Damon McGlory, was shown to be unreliable time and time again by defense counsel. Aikins points to the trial testimony of McGlory where, in a span of a few minutes, the defense counsel was able to force McGlory to admit to 12 instances where he had lied regarding this case. Thus, Aikins asserts that the testimony of McGlory cannot and should not be believed. As such, Aikins argues that the State's evidence against him, without the testimony of its unreliable key witness, was insufficient to prove he committed these crimes. Aikins further contends that there are many other examples of the State's witnesses lying in regards to this case.

From McGlory's testimony, it is abundantly clear that McGlory lied about numerous facts and on numerous occasions. It is also clear from the cross-examination of McGlory that he had the opportunity and the motive to change his story so that it would implicate Aikins. However, "[i]n reviewing the sufficiency of the ev-

idence this court will not reweigh the evidence. It is the jury's function, not ours, to weigh the evidence and determine the credibility of witnesses." *State v. Johnson,* 258 Kan. 475, 483-84, 905 P.2d 94 (1995). Aikins' defense counsel did an excellent job of cross-examining McGlory and pointing out all of the numerous inconsistencies in his testimony. The jury heard all of these inconsistencies and presumably evaluated them. Yet, "a jury is not bound to accept the defendant's version of the [facts] in question and, having convicted the defendant, the jury is presumed to have believed the State's evidence and to have drawn from it all inferences favorable to the State." *State v. Brunson,* 13 Kan. App. 2d 384, Syl. ¶ 2, 771 P.2d 938, *rev. denied* 245 Kan. 786 (1989).

Looking at McGlory's testimony in the manner we are required to view it, it becomes clear that the evidence was sufficient to convict Aikins of aggravated robbery and felony murder. McGlory testified that he, Nash, and Aikins knew that Kelly brought a gun with them on the trip from Parsons to Olathe. McGlory testified that twice he heard Nash, Kelly, and Aikins talking about robbing a liquor store the day of the robbery.

Further, Jessica Smith's testimony supported McGlory's testimony. She testified that she asked Aikins to give her a ride home from his apartment. According to Smith, Aikins said he would give her a ride home, then he looked over his shoulder to Nash and Kelly, said they had something to do first, and started laughing as if they had an inside joke. Smith testified that on the ride home, she thought there was going to be a robbery because Aikins and Kelly were acting secretive. According to Smith, the group stopped at a liquor store and Nash said there was too much light. At that time, Aikins said that he knew where another liquor store was and he drove to it. Smith testified that at the second liquor store, Aikins noticed it was closed and asked Smith where another liquor store was. Smith told the group about Martin's Liquor Store. According to Smith, Aikins parked the car next to the strip mall. Kelly got out of the car and walked with a limp to the liquor store. Smith testified that Aikins said, "He's in, he's in." Then Smith heard gunshots and Kelly came running out of the liquor store. According to Smith's testimony, Kelly got in the car and threw the gun in the back seat.

The gun hit Smith in the eye. Smith testified that Aikins asked what it looked like, and Kelly told Aikins it was like when the clerk got shot in the movie, "Menace to Society." Smith testified that Aikins drove away and asked Kelly how much money he stole. Smith also testified that Kelly threw the gun out the window and that Kelly's hat and bandannas came off while he was running back to the car. According to Smith, Nash told Aikins how to get back to Aikins' apartment, and the group drove back there.

Viewing this evidence in the light most favorable to the prosecution, a rational factfinder could have found Aikins guilty of aggravated robbery and felony murder beyond a reasonable doubt.

## CUMULATIVE ERROR

Finally, Aikins contends that cumulative error prevented him from receiving a fair trial and denied him due process. We do not find reversible error on any point raised by the defendant, either singularly or cumulatively.

Affirmed.